FILED
United States Court of Appeals
Tenth Circuit

January 7, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

WENDEL R. WARDELL, JR.,

    Defendant - Appellant.

No. 06-1108

---

**ORDER**

---

Before **MURPHY, BALDOCK,** and **HOLMES**, Circuit Judges.

---

The panel has decided, *sua sponte*, to withdraw the opinion issued on September 22, 2009, to correct a typographical error. It is replaced with the attached, revised opinion, which contains no substantive changes. Mr. Wardell's petition for panel rehearing is denied. His petition for rehearing en banc was transmitted to all of the judges of the court who are in regular active service as required by Rule 35 of the Federal Rules of Appellate Procedure. No poll was requested. Accordingly, Mr. Wardell's petition for rehearing en banc is denied.

The attached opinion is hereby substituted for the one issued on September 22, 2009.

Entered for the Court,

ELISABETH A. SHUMAKER, Clerk

FILED
United States Court of Appeals
Tenth Circuit

September 22, 2009

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

WENDEL R. WARDELL, JR.,

      Defendant - Appellant.

No. 06-1108

---

**Appeal from the United States District Court
for the District of Colorado
(No. 05-CR-342-REB)**

---

Submitted on the briefs:

Mark D. Jarmie, Jarmie & Associates, Albuquerque, New Mexico, for the Defendant-Appellant.

Troy A. Eid, United States Attorney, Matthew Kirsch, Assistant United States Attorney, James C. Murphy, Assistant United States Attorney, Denver, Colorado, for the Plaintiff-Appellee.

---

Before **MURPHY, BALDOCK**, and **HOLMES**, Circuit Judges.[*]

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

**HOLMES**, Circuit Judge.

Defendant Wendel R. Wardell, Jr., was charged, along with three codefendants, with (1) conspiring to retaliate against a witness, in violation of 18 U.S.C. § 1513(b)(1) and § 371 (2005),[1] and (2) retaliating against a witness, in violation of 18 U.S.C. § 1513(b)(1), and aiding and abetting the commission of this crime, in violation of 18 U.S.C. § 2.  The testimony of the witness in question, Jessie Cluff, was used to secure a conviction against Mr. Wardell for various tax-fraud offenses.  After testifying, Mr. Cluff was brutally beaten in a cell at the courthouse.  A video camera captured the attack.  Mr. Wardell was convicted on both counts along with his codefendants.

On appeal, Mr. Wardell argues that the evidence was insufficient to support his conviction on either count, and that the district court abused its discretion in requiring him to wear a stun belt at trial as a security precaution and in refusing to sever his trial from that of his codefendants.  In addition, Mr. Wardell contends that the district court erroneously calculated his sentencing range under the U.S. Sentencing Guidelines Manual ("U.S.S.G.") by applying an eight-level obstruction of justice enhancement, pursuant to § 2J1.2(b)(1)(A), and a two-level leader or

---

[1]     Unless otherwise noted, when citing to Title 18 of the United States Code, we cite to the 2005 version, which was in force at the time of the events giving rise to this action.

organizer enhancement, pursuant to § 3B1.1(c).[2] Mr. Wardell also challenges a number of the district court's discretionary decisions, including issues that we previously addressed in disposing of the appeal of his codefendant, Carl Pursley. Notably, Mr. Wardell argues that the district court violated the ex parte requirement of Fed. R. Crim. P. 17(b) in eliciting subpoena-related information from him in open court with the government present. We reject each of Mr. Wardell's challenges. Accordingly, we affirm the district court's judgment.

## BACKGROUND

While a more complete description of the facts of this case is presented in *United States v. Pursley*, 577 F.3d 1204, 1210-14 (10th Cir. 2009) ("*Pursley II*"), in which we affirm the district court's judgment against Mr. Wardell's codefendant, a factual summary is provided here, which should be helpful in understanding our opinion. Also, facts particularly relevant to some of Mr. Wardell's appellant issues are brought forth and highlighted in relation to our disposition of those issues.

Mr. Wardell and a fellow inmate, Mr. Pursley, were charged with various counts of federal tax fraud. *United States v. Wardell*, 218 F. App'x 695, 696-97 (10th Cir. 2007). Jessie Cluff, an inmate who participated in the tax-fraud scheme, testified against Mr. Wardell and Mr. Pursley. Subsequently, Mr. Cluff was

---

[2] The district court calculated Mr. Wardell's Guidelines sentence using the 2005 version of the U.S.S.G. The parties have voiced no concerns regarding that choice and accordingly we reference the 2005 version here.

3

assaulted in a holding cell at the federal courthouse in Denver, Colorado. A surveillance camera captured the assault, although it was not equipped for audio surveillance. Two inmates, Shawn Shields and Vernon Templeman physically carried out the assault. But it allegedly was directed by Mr. Wardell and Mr. Pursley.

The government indicted Mr. Wardell, Mr. Pursley, Mr. Shields, and Mr. Templeman on two counts: (1) conspiracy to retaliate against a witness, in violation of 18 U.S.C. § 1513(b)(1) and § 371, and (2) retaliation against a witness, in violation of 18 U.S.C. § 1513(b)(1), and aiding and abetting the commission of this crime, in violation of 18 U.S.C. § 2. The government alleged that Mr. Wardell and Mr. Pursley conspired with Mr. Shields and Mr. Templeman to effectuate the assault on Mr. Cluff, in retaliation for Mr. Cluff's testimony against Mr. Wardell and Mr. Pursley in the tax-fraud case.

Mr. Cluff testified that he took part in the tax-fraud scheme for which Mr. Wardell and Mr. Pursley were prosecuted. At the time, he was serving a 48-year sentence, the result of a long history of felony convictions. Mr. Cluff agreed to cooperate with the government in exchange for immunity. After giving a statement to the IRS, he began to fear for his safety. Mr. Cluff expressed his fears in a letter to IRS Agent Moon, who handled the investigation. Mr. Cluff testified that his fears escalated when Mr. Wardell simultaneously sent him: (1) a copy of his pretrial interview with Agent Moon, with markings next to those statements that

4

most incriminated Mr. Wardell; and (2) a letter, dated July 10, 2004, asking him to advise Mr. Wardell of any statements that had been attributed to Mr. Cluff and were not what he stated. Mr. Cluff interpreted this letter as an admonition to "change" his testimony. R., Vol. XII, Tr. at 451 (Jury Trial, dated Dec. 7, 2005).

At trial in this case, Mr. Cluff narrated the soundless videotape of the events preceding and during the assault. Mr. Shields's and Mr. Templeman's assault of Mr. Cluff lasted for approximately seventy seconds. The jury found each of the four defendants guilty on all of the counts for which they were indicted. We have previously affirmed the district court's judgment against Mr. Shields and Mr. Templeman. *See United States v. Templeman*, 481 F.3d 1263, 1266 (10th Cir. 2007); *United States v. Shields*, 219 F. App'x 808, 809 (10th Cir. 2007). And we also recently affirmed the district court's judgment against Mr. Pursley. *See Pursley II*, 577 F.3d at 1210.

At Mr. Wardell's sentencing, the district court generally adhered to the advisory Guidelines applications and calculations stated in the Presentence Investigation Report ("PSR"). Mr. Wardell's base offense level was 14. Mr. Wardell then received two enhancements: (1) an eight-level enhancement under U.S.S.G. § 2J1.2(b)(1)(A) for being convicted of an offense that caused physical injury to another person in order to obstruct the administration of justice; and (2) a two-level enhancement under U.S.S.G. § 3B1.1(c) for being a leader or organizer. With these two enhancements, Mr. Wardell's total offense level was 24.

5

Mr. Wardell's total offense level (24), coupled with his criminal history category (VI), yielded an advisory Guidelines range of 100 to 125 months for each offense. *See* U.S.S.G. ch. 5, pt. A, Sentencing Table. Pursuant to U.S.S.G. § 5G1.1, the district court then reduced the outer limit of the Guidelines range for each offense to the relevant statutory maximum. This reduction produced a final Guidelines range of 100 to 120 months for each count.[3] After considering the sentencing factors listed in 18 U.S.C. § 3553(a), the district court sentenced Mr. Wardell to 115 months of imprisonment for each offense and ordered these sentences to run concurrently.

Mr. Wardell filed a timely notice of appeal. We appointed appellate counsel, who filed an appellate brief on Mr. Wardell's behalf. Prior to the filing of this brief, Mr. Wardell filed a motion to represent himself. We denied this request, prompting Mr. Wardell to file yet another motion, seeking to represent himself. Although we did not immediately resolve this second motion, we did permit Mr. Wardell's attorney to withdraw, based in large part upon Mr. Wardell's desire to represent himself pro se. We then gave Mr. Wardell the opportunity to file a pro se

---

[3] The maximum term of imprisonment for the retaliation conviction was ten years. *See* 18 U.S.C. § 1513(b). With respect to the conspiracy conviction, the district court concluded that the maximum statutory penalty is ten years rather than five years because of the effect of the combined provisions of 18 U.S.C. §§ 371, 1513(b)(2), and 1513(e). Because Mr. Wardell does not challenge this latter analysis, we need not determine whether the district court properly applied 18 U.S.C. § 1513(e), rather than 18 U.S.C. § 371, to set the maximum penalty for the conspiracy conviction.

supplemental brief, which he subsequently filed.[4]

## DISCUSSION

On appeal, Mr. Wardell argues that the evidence was insufficient to support his conviction on either count; that the district court abused its discretion in requiring him to wear a stun belt at trial as a security precaution; and the district court abused its discretion in refusing to sever his trial from that of his codefendants. In addition, Mr. Wardell contends that the district court erroneously calculated his sentencing range under the Guidelines by applying an eight-level obstruction of justice enhancement, pursuant to § 2J1.2(b)(1)(A), and a two-level leader or organizer enhancement, pursuant to § 3B1.1(c). Moreover, Mr. Wardell raises a number of less substantive issues in his pro se capacity questioning the district court's discretion and echoing Mr. Pursley's appellate arguments. Significantly, Mr. Wardell does argue pro se, however, that the district court violated the ex parte requirement of Fed. R. Crim. P. 17(b) in eliciting subpoena-related information from him in open court with the government present. We reject each of Mr. Wardell's challenges. Accordingly, we affirm the district court's judgment.

### I. Sufficiency of the Evidence for the Conspiracy Conviction

---

[4] Since we have granted Mr. Wardell's counsel permission to withdraw, allowed Mr. Wardell to file a supplemental brief, and now deny Mr. Wardell relief on this appeal (for the reasons outlined herein), we deny Mr. Wardell's pending motion for self-representation as moot.

7

Mr. Wardell argues that the evidence was insufficient to sustain his conspiracy conviction. Mr. Wardell argues that the government failed to introduce evidence to establish that he participated in any agreement to assault Mr. Cluff and that he acted interdependently with any other alleged coconspirator.[5] For the reasons noted below, we cannot agree.[6]

We review de novo a challenge to the sufficiency of the evidence to sustain a criminal conviction.[7] *United States v. Weidner*, 437 F.3d 1023, 1032 (10th Cir.

---

[5] Mr. Wardell argues that because his conspiracy conviction was not grounded in sufficient evidence, his retaliation conviction also fails as a matter of law. As noted below, as to Mr. Wardell's conspiracy conviction, we conclude to the contrary; we discern sufficient evidence. Therefore, this legal argument regarding the retaliation conviction, which is predicated on the purported fatal evidentiary infirmities of the conspiracy conviction, cannot prevail. In addition, as will be explicated shortly, Mr. Wardell's more direct challenge to the proof supporting his retaliation conviction suffers a similar fate; it fails.

[6] In affirming the district court's judgment in the appeal of Mr. Wardell's codefendant, Mr. Shields, we concluded that "[t]he evidence of a conspiracy was overwhelming." *Shields*, 219 F. App'x at 810. However, in listing the members of the conspiracy in support of that conclusion, we did not mention Mr. Wardell. *Id.* Our silence regarding Mr. Wardell's participation in the conspiracy does not of course amount to a conclusion that he was *not* involved in the conspiracy. But our silence likewise does not validate the contention that he *was* involved in the conspiracy. Accordingly, we do not consider our conspiracy conclusion in Mr. Shields's appeal to be binding law of the case regarding Mr. Wardell's sufficiency-of-the-evidence challenge. *See, e.g.*, *United States v. LaHue*, 261 F.3d 993, 1010 (10th Cir. 2001) ("[W]hen a rule of law has been decided adversely to one or more codefendants, the law of the case doctrine precludes all other codefendants from relitigating the legal issue." (internal quotation marks omitted)). We proceed to reach the merits of Mr. Wardell's challenge.

[7] Mr. Wardell properly preserved his sufficiency-of-the-evidence

(continued...)

8

2006). We construe the facts in the light most favorable to the government. *See, e.g.*, *United States v. Franklin-El*, 554 F.3d 903, 908 (10th Cir.), *cert. denied*, 129 S. Ct. 2813 (2009). Sufficient evidence to support a conviction exists if "a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Willis*, 476 F.3d 1121, 1124 (10th Cir. 2007) (internal quotation marks omitted). In performing this analysis, we must "consider both direct and circumstantial evidence, and all reasonable inferences therefrom, in the light most favorable to the government." *Weidner*, 437 F.3d at 1032. We may not disturb the jury's credibility determinations nor weigh the evidence. *See United States v. Waldroop*, 431 F.3d 736, 742 (10th Cir. 2005). The evidence, however, "must generate more than a mere suspicion of guilt." *United States v. Fox*, 902 F.2d 1508, 1513 (10th Cir. 1990) (internal quotation marks omitted).

To convict a defendant under the general conspiracy statute, 18 U.S.C. § 371, the government must prove the following elements beyond a reasonable doubt: "(1) an agreement with another person to violate the law, (2) knowledge of the essential objectives of the conspiracy, (3) knowing and voluntary involvement, and

---

[7](...continued)
challenge. Mr. Wardell moved for a judgment of acquittal under Fed. R. Crim. P. 29(a) at the close of the government's case-in-chief, arguing that the evidence was insufficient to establish his role in any conspiratorial agreement. This motion was denied. It was renewed at the close of all of the evidence, and again denied. Mr. Wardell then filed a post-trial motion for a judgment of acquittal, pursuant to Fed. R. Crim. P. 29(c), which suffered a similar fate.

(4) interdependence among the alleged conspirators." *United States v. Rogers*, 556 F.3d 1130, 1138 (10th Cir.) (internal quotation marks omitted), *cert. denied*, 129 S. Ct. 2783 (2009); *United States v. Baldridge*, 559 F.3d 1126, 1136 (10th Cir.), *cert. denied*, 129 S. Ct. 2170 (2009).  During the conspiracy, at least one of the coconspirators must commit an overt act in furtherance of the conspiracy.  *United States v. Thompson*, 518 F.3d 832, 853 (10th Cir.), *cert. denied*, 129 S. Ct. 487 (2008).  Furthermore, a conviction for conspiracy requires the defendant to possess at least the degree of criminal intent necessary for the substantive offense that the parties are conspiring to commit.  *Weidner*, 437 F.3d at 1033.

Because "secrecy and concealment" are frequently essential to a successful conspiracy, "direct evidence of conspiracy is often hard to come by."  *United States v. Dazey*, 403 F.3d 1147, 1159 (10th Cir. 2005) (alteration and internal quotation marks omitted) (quoting *Blumenthal v. United States*, 332 U.S. 539, 557 (1947)); *see Thompson*, 518 F.3d at 853.  Thus, "conspiracy convictions may be based on circumstantial evidence, and the jury may infer conspiracy from the defendants' conduct and other circumstantial evidence indicating coordination and concert of action."  *Dazey*, 403 F.3d at 1159.

Mr. Wardell argues that the government introduced nothing but evidence of "mere association."  Aplt. Opening Br. at 29.  In particular, Mr. Wardell contends that the government's circumstantial evidence demonstrated only that:  (1) he was associated with Mr. Pursley; (2) he was convicted of conspiracy to commit tax

10

fraud; and (3) he attempted to dissuade Mr. Cluff from testifying against him in the tax-fraud case. No reasonable jury could find from this evidence, reasons Mr. Wardell, that the government proved the "agreement" and "interdependence" elements of the conspiracy offense beyond a reasonable doubt. *Id*. at 26-31. We assess Mr. Wardell's argument in the context of the elements required to establish conspiracy.

## A. Agreement

The foundation of a conspiracy is the agreement to commit an unlawful act. An agreement to violate the law may be express or implied. *United States v. Whitney*, 229 F.3d 1296, 1301 (10th Cir. 2000). As we have stressed, an agreement "may be inferred entirely from circumstantial evidence." *Id*. Relevant circumstantial evidence includes: the joint appearance of defendants at transactions and negotiations in furtherance of the conspiracy; the relationship among codefendants; mutual representations of defendants to third parties; and other evidence suggesting "'unity of purpose or common design and understanding' among conspirators to accomplish the objects of the conspiracy." *United States v. Dowlin*, 408 F.3d 647, 657 (10th Cir. 2005) (quoting *United States v. Kendall*, 766 F.2d 1426, 1431 (10th Cir. 1985)).

Nevertheless, "mere association," standing alone, is inadequate; an individual does not "become a member of a conspiracy merely by associating with conspirators known to be involved in crime." *United States v. Powell*, 982 F.2d

11

1422, 1429 (10th Cir. 1992). The touchstone of the analysis, therefore, is whether "the circumstances, acts, and conduct of the parties are of such a character that the minds of reasonable men may conclude therefrom that an unlawful agreement exists." *Dazey*, 403 F.3d at 1159 (internal quotation marks omitted).

The government introduced sufficient evidence from which a reasonable jury could find beyond a reasonable doubt that Mr. Wardell knowingly entered into, and participated in, an unlawful agreement with Mr. Shields, Mr. Templeman, and Mr. Pursley to assault Mr. Cluff. Multiple pieces of evidence, when analyzed collectively and in the light most favorable to the government, take the government's proof of conspiracy beyond the realm of mere association.

The government introduced evidence of Mr. Wardell's motive to organize the conspiracy. The jury heard testimony that Mr. Wardell took unsuccessful steps to deter Mr. Cluff from testifying prior to the tax-fraud trial. He commanded Mr. Cluff to keep his "mouth shut" during the investigation. R., Vol. XI, Tr. at 283 (Jury Trial, dated Dec. 6, 2005). When this strategy failed, Mr. Wardell slipped a "letter" to "one of his friends" at Mr. Cluff's prison. Aplee. Br. Attach. 1, at 1 (Gov't Ex. No. 8, dated Nov. 17, 2003). This action caused Mr. Cluff to fear for his life. He penned a letter to IRS Agent Moon, who handled the tax-fraud investigation. Although at the time he expressed no particularized fear of Mr. Wardell, he noted that "as sure as I'm writing this letter they will kill me after I testify." *Id.* The "they" to whom Mr. Cluff referred was "[Mr.] Pursley and his

12

friends." *Id.* Mr. Wardell admittedly had a "long-standing friendship" with Mr. Pursley. Aplt. Opening Br. at 31.

Closer to trial, Mr. Wardell also sent Mr. Cluff a copy of Agent Moon's interview memorandum, which memorialized Mr. Cluff's pretrial statement. He asked Mr. Cluff to "review" and "verify" the most incriminating aspects of his statement, which he had "highlighted." Aplee. Br. Attach. 2, at 2-8 (Gov't Ex. No. 9, dated July 10, 2004); *see also* R., Vol. XII, Tr. at 444, 450-51. Although the July 10, 2004 letter could be construed as Mr. Wardell's pro se attempt to ascertain the veracity of Agent Moon's notes, a reasonable juror also could have interpreted this letter as Mr. Cluff did—as a form of coercion, a way of getting Mr. Cluff to "change" his testimony prior to trial. R., Vol. XII, Tr. at 451.

Mr. Wardell's motive for retaliation only intensified after Mr. Cluff testified in the tax-fraud case. Mr. Cluff's testimony primarily inculpated Mr. Wardell, with whom Mr. Cluff prepared and filed the fraudulent tax returns. By contrast, neither Mr. Shields nor Mr. Templeman was implicated in the tax-fraud prosecution. In fact, Mr. Cluff testified that he had never met Mr. Templeman prior to the day of the assault, and that he first met Mr. Shields a week earlier in the courthouse jail while waiting to testify. Moreover, Agent Moon testified that neither Mr. Shields's nor Mr. Templeman's name surfaced during her tax-fraud investigation. Given the absence of any apparent motive of Mr. Shields and Mr. Templeman to retaliate against Mr. Cluff, a reasonable jury could have inferred that Mr. Shields and Mr.

13

Templeman did not work alone, and that, at the very least, they perpetrated the assault in conjunction with the person most damaged by Mr. Cluff's testimony in the tax-fraud case—Mr. Wardell.

Circumstantial evidence also indicated the nature of Mr. Wardell's role in orchestrating the assault through the writ process. On or about May 12, 2005,[8] Mr. Pursley's attorney in the tax-fraud case obtained two writs of habeas corpus ad testificandum to bring Mr. Shields and Mr. Templeman from prison to the courthouse. Both appeared on Mr. Wardell's witness list, but neither was called to testify. In fact, Mr. Shields admitted to Mr. Cluff that the whole purpose of his trip was to perpetrate the assault. Thus, given Mr. Wardell's "long-standing

---

[8] Mr. Wardell argues that the government's evidence of an agreement is "dubious at best" because although the government "relied heavily on the proposition that the conspiracy began on or about May 12, 2005, when Defendants Shawn Shields and Vernon Templeman were brought to Denver pursuant to writs filed in the tax case," another exhibit allegedly demonstrated that "Mr. Templeman was brought on May 11, 2005." Aplt. Br. at 28. This argument lacks merit for several reasons. First, assuming the validity of such an exhibit, the indictment explains that the non-exhaustive list of overt acts it describes commenced "on or about"—rather than "on"—May 12, 2005. R., Vol. I, Doc. 1, at 2 (Indictment, dated July 26, 2005). *See, e.g.*, *United States v. Charley*, 189 F.3d 1251, 1272 (10th Cir. 1999) (noting that "on or about" language in indictment allows for offense to be committed within a few weeks of the specified date). Second, even if Mr. Templeman was brought to the courthouse on May 11, 2005, rather than on May 12, 2005, this fact in no way undermines the inference of a conspiratorial agreement from the writ that secured Mr. Templeman's presence. Third, even if there was some doubt as to Mr. Templeman's involvement in the conspiratorial agreement, the government introduced sufficient evidence to establish Mr. Wardell's participation in an agreement with Mr. Pursley and Mr. Shields.

friendship" with his codefendant (Mr. Pursley), Aplt. Br. at 31, and the fact that Messrs. Shields and Templeman appeared on Mr. Wardell's witness list for the tax-fraud case when they apparently had nothing to offer, a reasonable jury could infer that Mr. Wardell participated in the strategic decision with Mr. Pursley to bring the two men to the courthouse for the sole purpose of assaulting Mr. Cluff.

In addition, evidence could support the proposition that Mr. Shields, Mr. Pursley, and Mr. Wardell confirmed the existence of this agreement on the day of the assault. Mr. Hoskins (another prisoner) testified that he was in the van with Mr. Wardell and Mr. Pursley on the way to the courthouse and that, prior to picking up Mr. Shields, Mr. Pursley asked Mr. Hoskins to move over because they were picking up a friend and wanted to speak with him. Then, although Mr. Pursley and Mr. Shields did most of the talking, Mr. Wardell participated with them in a whispered conversation during the nearly one-hour van ride. Using "logical and probabilistic reasoning," *United States v. Truong*, 425 F.3d 1282, 1288 (10th Cir. 2005) (internal quotation marks omitted), a reasonable jury could have inferred that the theme of this clandestine conversation was the imminent assault, rather than the merits of the tax-fraud case, in large part because Agent Moon's and Mr. Cluff's testimony indicated that Mr. Shields had no involvement in the tax fraud and, bolstering that point, he in fact was never called to testify.

Mr. Shields's alleged admissions just prior to the assault further confirmed the agreement to retaliate against Mr. Cluff for his prior testimony against Mr.

15

Wardell and Mr. Pursley. According to Mr. Cluff, Mr. Shields told him "that [his] worst nightmare had come true. That he [Mr. Shields] was friends with Carl Pursley." R., Vol. XII, Tr. at 467. Mr. Shields then labeled Mr. Cluff a "lying rat," stating that he had read Mr. Cluff's "statement" to Agent Moon—seemingly the same statement that Mr. Wardell had sent to Mr. Cluff with incriminating passages highlighted. *Id.* at 468-69. Although Mr. Cluff pleaded that he never testified against Mr. Pursley, Mr. Shields refused to believe him. Aware that Mr. Shields had no prior connection to Mr. Cluff, the jury was entitled to attribute Mr. Shields's extensive knowledge of Mr. Cluff's role as a government witness (i.e., a purported "rat") in the tax-fraud prosecution, not only to the machinations of Mr. Pursley, but also to Mr. Wardell—who had contact with Mr. Shields and participated in a furtive conversation involving him on the very day of the assault. In other words, they could have rationally inferred that Mr. Pursley and Mr. Wardell had conspired to lay the informational ground work with Mr. Shields for the subsequent assault of Mr. Cluff, with the criminal objective that the retaliatory assault take place.

The jury heard testimony that immediately prior to the assault's occurrence Mr. Wardell took steps to ensure its success. For instance, Mr. Hoskins testified that after he was placed in the cell with Mr. Wardell and Mr. Pursley, he heard someone from Mr. Shields's cell ask, "Guess who is in here with me?" *Id.* at 575-76 (internal quotation marks omitted). Either Mr. Wardell or Mr. Pursley

16

commented about "the rat fuck that's testifying," and Mr. Shields laughed. *Id.* at 576. One of the two men then said, "Shorty will take care of him,"[9] and requested "everyone to start making a lot of noise so the guards couldn't hear what was going on in the other cell." *Id.* at 576-77 (internal quotation marks omitted). Everyone in the cell, including Mr. Wardell, then generated the requested clamor.

From Mr. Hoskins's testimony, a jury reasonably could have found that Mr. Wardell facilitated the assault by working with Mr. Pursley to orally identify Mr. Cluff as a "rat" and working with Mr. Pursley to instruct others to make noise to overcome the sounds of the assault. Such a reasonable inference from the evidence would have established Mr. Wardell's knowledge of and participation in the plot (i.e., conspiracy) to attack Mr. Cluff.

Finally, the jury also heard evidence suggesting that, after the assault, Mr. Wardell tacitly acknowledged his own involvement in the conspiracy. Mr. Cluff testified that after the assault, Mr. Wardell yelled out, "That's what you get, you *fucking rat.*" *Id.* at 472 (emphasis added) (internal quotation marks omitted). He then issued another threat stating, "If you know what's good for you, you better have your mom send me some money." *Id.* These statements clearly link Mr. Wardell to the agreement to assault Mr. Cluff in retaliation for his testimony in the

---

[9] As we noted in *Pursley II*, "Shorty" was Mr. Shields's nickname. *See Pursley II*, 577 F.3d at 1213 n.5.

tax-fraud case.[10]

## B. Interdependence Element

We require interdependence among coconspirators. *See, e.g.*, *Baldridge*, 559 F.3d at 1136; *United States v. Edwards*, 540 F.3d 1156, 1158 (10th Cir. 2008). Interdependence is present if "the activities of a defendant charged with conspiracy facilitated the endeavors of other alleged coconspirators or facilitated the venture as a whole." *United States v. Horn*, 946 F.2d 738, 740-41 (10th Cir. 1991); *see Rogers*, 556 F.3d at 1138-39 ("Interdependence is established when each co-conspirators' actions are necessary to accomplish a common, illicit goal.").

The same evidence that supports Mr. Wardell's participation in the agreement to assault Mr. Cluff also satisfies the interdependence element. As discussed, a reasonable jury could have found from the government's evidence that: (1) Mr. Wardell wanted retribution for Mr. Cluff's testimony against him during the tax-fraud case; (2) he acted in concert with Mr. Pursley to subpoena Mr. Shields

---

[10]    Although Mr. Wardell suggests on appeal that these statements were inadmissible, he never raised a contemporaneous objection at trial. He has also failed to adequately brief this issue. *See* Fed. R. App. P. 28(a)(9); *Bronson v. Swensen*, 500 F.3d 1099, 1105 (10th Cir. 2007) (noting that "cursory statements, without supporting analysis and case law, fail to constitute the kind of briefing that is necessary to avoid application of the forfeiture doctrine"); *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1133 n.4 (10th Cir. 2004) ("Scattered statements in the appellant's brief are not enough to preserve an issue for appeal."). Moreover, even if we were inclined to address Mr. Wardell's suggestion, we would conclude that these statements were admissible under Fed. R. Evid. 801(d)(2)(A) as the "party's own statement[s]." Fed. R. Evid. 801(d)(2)(A).

18

and Mr. Templeman to the courthouse for the sole purpose of executing the assault; (3) he met with Mr. Pursley and Mr. Shields on the day of the assault to confirm the plan; (4) he helped facilitate the assault from his cell; and (5) after the assault, he menacingly confirmed (albeit tacitly) his involvement by describing Mr. Cluff's assault as a form of poetic justice. These reasonable findings would have established beyond a reasonable doubt that the success of the venture as a whole—Mr. Cluff's beating—depended upon the steps Mr. Wardell took to realize this common goal.

## II. Sufficiency of the Evidence for the Retaliation Conviction

Mr. Wardell also challenges his conviction for retaliating against a witness pursuant to 18 U.S.C. § 1513(b)(1). To convict a defendant under § 1513(b)(1), the government must prove beyond a reasonable doubt that (1) the defendant knowingly engaged in conduct either causing, or threatening to cause, bodily injury to another person, and (2) acted with the intent to retaliate for, *inter alia*, the testimony of a witness at an official proceeding. 18 U.S.C. § 1513(b)(1); *see United States v. Cofield*, 11 F.3d 413, 419 (4th Cir. 1993) (listing elements of offense). The doctrine announced by the Supreme Court in *Pinkerton*, on which the jury was instructed, forecloses Mr. Wardell's sufficiency-of-the-evidence challenge. The *Pinkerton* doctrine holds each member of a conspiracy legally responsible for the reasonably foreseeable crimes of fellow conspirators committed in furtherance of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 647

19

(1946); *see also United States v. Hernandez*, 509 F.3d 1290, 1295 (10th Cir. 2007) (noting that "the doctrine of vicarious liability plays a critical role in the context of conspiracy cases"); *United States v. Russell*, 963 F.2d 1320, 1322 (10th Cir. 1992) (applying doctrine).

The government proved the elements for *Pinkerton* culpability. As discussed, the government introduced sufficient evidence to convict Mr. Wardell of the conspiracy charge. It also introduced undisputed evidence that Mr. Shields and Mr. Templeman, coconspirators, completed the intended object of the conspiracy—*viz.*, they attacked Mr. Cluff in retaliation for his testimony against Mr. Wardell and Mr. Pursley. *See Hernandez*, 509 F.3d at 1298 (noting that the defendant is culpable for acts that are within the scope of the conspiracy and reasonably foreseeable by the defendant). Hence, pursuant to the *Pinkerton* doctrine, Mr. Wardell was legally responsible for the physical attack on Mr. Cluff, regardless of whether *his* physical acts independently satisfied the technical elements of § 1513(b).

Furthermore, Mr. Wardell's conviction under § 1513(b)(1) can be sustained under an aiding and abetting theory, on which the jury was also charged. A reasonable jury could have found from the evidence in support of the conspiracy conviction that Mr. Wardell aided and abetted Mr. Shields and Mr. Templeman in effectuating the assault. *See* 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures

20

its commission, is punishable as a principal."). Indeed, this circumstantial evidence established beyond a reasonable doubt that Mr. Wardell "willfully associate[d] himself with the criminal venture and [sought] to make the venture succeed through some action of his own." *United States v. Leos-Quijada*, 107 F.3d 786, 794 (10th Cir. 1997); *see also United States v. Wardy*, 777 F.2d 101, 106-07 (2d Cir. 1985) (affirming conviction under §§ 1513 and 2(a) when defendant, a prisoner, informed intermediary outside of prison that he wanted codefendant to "take care" of witness in retaliation for statements to police).

### III.  Use of Stun Belt

In his pro se filing, Mr. Wardell argues that the district court committed reversible error by requiring him to wear a stun belt during trial.[11]  He contends that this condition violated his Fifth and Sixth Amendment rights.  Mr. Wardell appears to contend that the district court infringed these constitutional rights in two

---

[11]    In connection with his stun-belt argument, Mr. Wardell contends that he was prejudiced by what he calls the district court's "bizarre seating arrangement," under which all defendants were facing the jury.  Aplt. Supp. Pro Se Br. at 20 (all capitals typeface omitted).  Initially, we do not discern any indication in the record that the district court adopted this seating arrangement due to security concerns; instead, the number of litigants seemed to be the decisive factor.  R., Vol. IX, Tr. at 14 (Pretrial Conference, dated Mar. 27, 2006) (explaining to Mr. Wardell that the seating arrangement of the prior tax-fraud trial could not be used "because we have literally twice as many people").  Moreover, not only did Mr. Wardell not object to this seating arrangement after the district court explained the reasoning behind it, he affirmatively indicated that it was "Okay" or acceptable.  *Id.* at 15.  Therefore, Mr. Wardell has waived any purported constitutional objection to the seating arrangement.  *See, e.g.*, *United States v. Cruz-Rodriguez*, 570 F.3d 1179, 1183 (10th Cir. 2009).

21

ways.  First, he asserts that—contrary to the district court's finding—the stun belts were actually visible to the jury.  *See, e.g.*, Aplt. Supp. Pro Se Br. at 22 ("While the Court spuriously stated that the stun belts were inconspicuous, even the manufacturer of the stun belts admits that the stun belts are visible to observers.").  Second, for the first time on appeal, Mr. Wardell seems to contend that the wearing of the stun belt itself was prejudicial because of the alleged capacity of such devices to engender in the wearer psychological stress and fear due to the allegedly severe and detrimental physical effects of the device's activation.  *See, e.g.*, *id.* at 38 ("The evidence is clear that fear of activation of the stun belt is *designed* to and *does*, cause a defendant enormous anxiety, such that his entire focus remains on its avoidance.  Thus, it causes a substantial probability of trial prejudice by impinging on the exercise of his most fundamental constitutional rights.").  Mr. Wardell also contends that the district court failed to make adequate findings to justify the use of stun belts.  *See, e.g.*, *id.* ("The district court gave no consideration to lesser restraints and made no adequate findings that forcing Messrs. Pursley and Wardell to wear a stun belt . . . was necessary.").  We uphold the district court's stun-belt order.

While a defendant enjoys the "right to appear before the jury unfettered from physical restraints," this right is not unqualified.  *United States v. Hack*, 782 F.2d 862, 867 (10th Cir. 1986).  Freedom from restraint helps to preserve, among other constitutional guarantees, "the due process right to a fair and impartial trial."

22

*United States v. Apodaca*, 843 F.2d 421, 430-31 (10th Cir. 1988). A district court, however, retains the discretion to take measures to maintain order and security within its courtroom. *See Deck v. Missouri*, 544 U.S. 622, 632 (2005) (recognizing the "need to give trial courts latitude in making individualized security determinations"); *Hack*, 782 F.2d at 867 (acknowledging the significant deference given to the trial court in determining whether security measures are necessary regarding a particular defendant). The decision to impose a security measure that physically restrains a defendant during trial "will not be disturbed on appeal unless that discretion was clearly abused." *Hack*, 782 F.2d at 867. Nonetheless, because of the various constitutional concerns that flow from such a decision, it triggers "close judicial scrutiny." *Estelle v. Williams*, 425 U.S. 501, 504 (1976); *see also United States v. Durham*, 287 F.3d 1297, 1306 (11th Cir. 2002) (applying close judicial scrutiny to the use of stun belts).

The standard for determining whether a district court abused its discretion—and, in the process, violated a defendant's constitutional rights—hinges on the nature and effect of the restraint. For instance, the Supreme Court has deemed *visible* shackling to be an inherently prejudicial practice, *see Deck*, 544 U.S. at 635 (sentencing); *Illinois v. Allen*, 397 U.S. 337, 344 (1970) (trial), because it undermines three fundamental legal principles of constitutional origin: (1) the presumption of innocence; (2) a defendant's ability to participate in his or her own defense; and (3) the dignity of the trial process. *Deck*, 544 U.S. at 630-32. Thus,

23

because of the presumed prejudice of visible shackling, *id.* at 635, it may only be used when it serves an "essential" interest "specific" to a particular case. *Id.* at 628, 633. Security needs or escape risks "related to the defendant on trial" constitute such an interest. *Id.* at 633.

Consistent with the principles confirmed in *Deck*, we have recognized the district court's legal obligation to consider individualized factors in determining whether to deviate from the general rule prohibiting physical restraints. *Hack*, 782 F.2d at 868. In particular, the district court should consider "the [defendant's] record, the crime charged, his physical condition, and other available security measures." *Id.* Of course, the "extent to which the security measures are needed should be determined by the trial judge on a case-by-case basis." *Id.*

We believe that these principles should apply to stun belts because, as numerous circuits have recognized, "[t]he use of stun belts, depending somewhat on their method of deployment, raises all of the traditional concerns about the imposition of physical restraints." *Gonzalez v. Pliler*, 341 F.3d 897, 900 (9th Cir. 2003); *see, e.g.*, *Durham*, 287 F.3d at 1306. If seen or activated, a stun belt "might have a significant effect on the jury's feelings about the defendant." *Allen*, 397 U.S. at 344. It also challenges "the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." *Id.* Put simply, we recognize that requiring a defendant in a criminal trial to wear a visible stun belt, like restraining him with visible shackles, may erode a defendant's constitutional presumption of

24

innocence.

However, despite this potential for prejudice, we have approved the use of a stun belt at trial under certain circumstances. In *United States v. McKissick*, 204 F.3d 1282 (10th Cir. 2000), we found no abuse of discretion in a district court's refusal to grant a mistrial after the defendant's attorney learned that his client, who was charged with firearm and drug possession, was forced to wear a stun belt underneath his clothes. *Id.* at 1286, 1299. We noted that the district court clearly articulated its reasons for the safety measure, including one intimately related to the security of the courtroom—the possibility of gang members seeking to disrupt the trial proceedings. *Id.* We then reasoned that the belt was inconspicuous and that "there [was] no evidence in the record that any member of the jury noticed the stun belt[]." *Id.* Thus, we refused to "presume prejudice." *Id.*

In reaching our conclusion, we relied upon *Yates v. United States*, 362 F.2d 578 (10th Cir. 1966). *Yates* affirmed the denial of a mistrial because although the defendant entered the courtroom in shackles on one occasion, there was no evidence that "any juror had in fact observed appellant under restraint." *Id.* at 579; *cf. Hack*, 782 F.2d at 867-68 (noting that visible shackles were justified by a substantial need to protect the safety of the court from the violent propensities of defendant and to prevent threatened escape). We did not purport, in *McKissick*, to address all the constitutional concerns associated with the use of stun belts. What is clear from *McKissick,* however, is that similar to the restraint of shackling, we

25

should not "presume prejudice" when there is no evidence that the jury noticed the stun belt. *McKissick*, 204 F.3d at 1299.

Under our precedent, a district court's decision to require a defendant to wear a stun belt during a criminal trial would appear ordinarily to pose no constitutional problem when: (1) the court makes a defendant-specific determination of necessity resulting from security concerns; and (2) it minimizes the risk of prejudice by, for instance, concealing the stun belt from the jury. *See id.*; *cf. Apodaca*, 843 F.2d at 431 (affirming the use of a leg chain when the judge articulated safety reasons and took "precautions to ensure that any prejudicial effect of the physical restraint was minimized"). Other circuits have rejected constitutional claims arising from the compulsory use of a stun belt under similar circumstances. *See, e.g.*, *United States v. Fields*, 483 F.3d 313, 357 (5th Cir. 2007) (finding no abuse of discretion by the district court in requiring the use of a stun-belt restraint on a pro se defendant when the defendant was found to have a history of prison escapes and violence and when the district court minimized the risk of prejudice by permitting the defendant to conceal the stun belt and requiring both sides to remain seated before the jury); *United States v. Brooks*, 125 F.3d 484, 502 (7th Cir. 1997) (approving, *inter alia*, the use of stun belts because restraint was necessary and the stun belt, which was hidden under clothes, was method of restraint that minimized risk of prejudice); *see also United States v. Joseph*, 333 F.3d 587, 591 (5th Cir. 2003) ("The district court properly stated the reasons for

the use of [a stun belt and shackles].  Further, there is no evidence that the jury was prejudiced by the presence of these restraints, as the stun belt was not activated during the trial, and both the belt and the shackles were kept out of the view of the jury.").

Even those circuits that have found constitutional error from the use of a stun belt during a criminal trial have applied a similar standard.  *See Gonzalez,* 341 F.3d at 901 (requiring district court to articulate compelling, security-related circumstances and to "pursue less restrictive alternatives" (citation and internal quotation marks omitted)); *Durham*, 287 F.3d at 1306-07 (noting that the court must "assess whether an essential state interest is served by compelling a particular defendant to wear such a device, and must consider less restrictive methods of restraint"); *cf. United States v. Miller*, 531 F.3d 340, 345-47 (6th Cir.) (holding that "the district court's cursory approval of the use of a stun belt fell far below the individualized determination required by" Sixth Circuit precedent but that the error did not prejudice defendant, and noting generally that "a decision to use a stun belt must be subjected to at least the same close judicial scrutiny required for the imposition of other physical restraints" and "caution[ing] that such physical restraints should be used as rarely as possible." (citations and internal quotation marks omitted)), *cert. denied*, 129 S. Ct. 307 (2008).  Indeed, both the *Gonzalez* and *Durham* courts found such error *only* after the trial court failed to satisfy its legal duty to make a thorough and independent determination of the device's

27

necessity. *See Gonzalez*, 341 F.3d at 901-02 (noting that the bailiff's decision to use a stun belt did not undergo close judicial scrutiny); *Durham*, 287 F.3d at 1308 (noting that the district court failed to articulate sufficient reasons for imposing the use of a stun belt).[12]

Applying the legal principles outlined above, we reject Mr. Wardell's challenge to the district court's decision to require him to wear a stun belt at trial. The court set out in a written order its justification for requiring Mr. Wardell and his codefendants to wear stun belts:

> The nature of the crimes with which the defendants are charged in this case, as well as their histories and characters as known to me, make the use of enhanced security measures necessary and prudent. The devices are concealed on the defendants' persons so that they are largely inconspicuous. The use of the devices correspondingly reduces the number of security personnel necessary to be present in the courtroom during the trial and eliminates the need for handcuffs and shackles. Such personnel and physical restraints are inherently more conspicuous and thus more prejudicial to defendants tha[n] the use of stun belts.

R., Vol. II, Doc. 329, at 2 (Findings of Fact and Conclusions of Law Regarding the Use of Stun Belts During Trial, filed Dec. 5, 2005) (footnote omitted).

---

[12] At least one state supreme court has permanently banned stun belts from its courtrooms, reasoning that "other forms of restraint . . . can do the job without inflicting the mental anguish that results from simply wearing the stun belt and the physical pain that results if the belt is activated." *Wrinkles v. State*, 749 N.E.2d 1179, 1195 (Ind. 2001). Of course, faithful adherence to precedent from the United States Supreme Court, as well as our own case law, forecloses reliance upon this logic.

Therefore, "considering the totality of the circumstances," the district court concluded that it could permissibly authorize the use of stun belts. *Id.*

Under the district court's rationale, the conditions that justified the use of stun belts in *McKissick* are present here. The district court found that the stun belt was a necessary security measure because of the nature of the crimes with which the defendants were charged in this case, as well as their history and character. More generally, the two circumstances that our court and some of our sister circuits have considered important in assessing a trial court's use of security restraints—(1) the court's articulation of a defendant-specific necessity determination, and (2) the court's steps to minimize the risk of prejudice—strongly support the conclusion that the district court did not abuse its discretion.

Two of Mr. Wardell's previous convictions were for escape-related crimes. Perhaps more importantly, the nature of the charged offenses—conspiring to and facilitating the brutal attack of the government-adversary's witness—suggested the need for heightened security during a joint trial where the victim of the assault would be the key government witness. Furthermore, we give significant weight to the fact that the district court had an opportunity to observe Mr. Wardell's demeanor and character during the tax-fraud trial.[13]

---

[13]    Admittedly, we would harbor some concern if the district court relied

(continued...)

Mr. Wardell's decision to represent himself also supported the district court's finding of necessity. Mr. Wardell's pro se status brought with it the privilege of being in closer proximity to the judge, the jurors, and the trial witnesses than a typical defendant. This proximity, in turn, increased the gravity of the safety concerns at issue. *See Weaver v. State*, 894 So.2d 178, 194 (Fla. 2004) (noting that defendant's "argument that the trial court erred in ordering the use of a stun belt is especially weak in light of his *pro se* status").

The district court also took adequate steps to minimize the risk of prejudice. It concealed the stun belt under Mr. Wardell's clothing, rendering the device largely inconspicuous. Although Mr. Wardell takes exception to the district court's finding that the stun belts were essentially concealed and not visible to the jury, he offers nothing more than speculation to the contrary. In particular, Mr. Wardell identifies nothing in the record that would indicate that a juror observed the stun belts. Accordingly, we do not hesitate to credit the

---

[13](...continued) upon Mr. Wardell's myriad convictions for fraud-related offenses, each of which appears to have lacked a violent component. *Cf. Miller*, 531 F.3d at 346 ("[W]e are troubled by the government's argument on appeal that the use of a stun belt was warranted because [the defendant] was facing significant prison time and because [the defendant] had been evasive and untruthful in a prior hearing before the district court. Although we do not condone [the defendant's] behavior with the district court, neither of these factors justifies the use of physical restraints."). But such reliance is not explicit (much less patent) from the record and thus we operate on the premise that the district court focused on Mr. Wardell's relevant escape-related crimes and the overall circumstances of this case, including the court's impressions of Mr. Wardell's personal demeanor.

district court's finding concerning the lack of visibility of the stun belts. The district court further found this safety measure to be less compromising than other conceivable alternatives, such as handcuffs, shackles, or additional security guards, given their comparatively heightened visibility. *See Fields*, 483 F.3d at 357 (noting that "the court took into account the special problems that physical restraints might pose under Fields's decision to proceed *pro se*").

Mr. Wardell also suggests that the wearing of the stun belt itself was constitutionally prejudicial because of the alleged capacity of such devices to produce in the wearer psychological stress and fear due to the wearer's awareness of the allegedly severe and detrimental physical effects that will occur if the device is actually activated. This argument has been the subject of judicial attention. As one of our sister circuits noted,

> [t]he fear of receiving a painful and humiliating shock for any gesture that could be perceived as threatening likely chills a defendant's inclination to make any movements during trial—including those movements necessary for effective communication with counsel.
>
> . . . Wearing a stun belt is [also] a considerable impediment to a defendant's ability to follow the proceedings and take an active interest in the presentation of his case. It is reasonable to assume that much of a defendant's focus and attention when wearing one of these devices is occupied by anxiety over the possible triggering of the belt.

*Durham*, 287 F.3d at 1305-06. However, Mr. Wardell concedes that he did not raise this psychological-impact argument before the district court. Aplt. Supp.

31

Pro Se Br. at 30 (noting that with adequate notice of the district court's stun-belt directive defendants "*would have argued* the psychological impact on them, which affected their Sixth Amendment rights and that communication with counsel was limited by the belt"(emphasis added)).[14]  And our review of the

---

[14]     Mr. Wardell complains that he was "given no advance notice of the intended use of the stun belt" and, consequently, he was "ill-prepared" to raise the psychological-impact argument before the district court.  Aplt. Supp. Pro Se Br. at 30.  More specifically, Mr. Wardell contends the he did not receive the government's motion proposing that the defendants be required to wear stun belts until some period after the United States Marshals placed a stun belt on him immediately prior to the start of his trial.  *Id.* at 21.  Assuming *arguendo* that such a notice complaint could ever relieve Mr. Wardell of the burdens of plain error review where the issue is enhanced security procedures, this would not be a case warranting such relief.  Although Mr. Wardell claims to have not received the government's motion prior to the day of trial, he was aware of its existence because it was discussed in a pretrial conference a few days before the trial started.  R., Vol. IX, Tr. at 19.  Significantly, in that discussion, the court denied the government's motion as moot, on the basis that it would sua sponte fashion security measures for the trial.  *Id.*  Therefore, Mr. Wardell was well aware that some security measures would be forthcoming.  Furthermore, there is no indication in the record that Mr. Wardell raised his notice complaint before the district court and sought a continuance or some other form of relief due to the purported prejudice arising from the lack of notice.  *Cf. Irizarry v. United States*, 128 S. Ct. 2198, 2203 (2008) ("We recognize that there will be some cases in which the factual basis for a particular sentence will come as a surprise to a defendant or the Government.  The more appropriate response to such a problem is not to extend the reach of Rule 32(h)'s notice requirement categorically, but rather for a district judge to consider granting a continuance when a party has a legitimate basis for claiming that the surprise was prejudicial.").  Nor did Mr. Wardell subsequently seek reconsideration of the district court's stun-belt order on psychological-impact grounds, despite the fact that he was forced to wear the stun belt throughout the trial, not just on the first day.  Accordingly, Mr. Wardell's notice complaint is unavailing.  *Cf. United States v. Lopez-Pena*, 912 F.2d 1542, 1546 (1st Cir. 1989) ("Ordinarily, the law ministers to the vigilant, not to those who sleep upon their rights.  In consequence, a litigant . . . must usually

(continued...)

32

record validates this concession. Accordingly, we review only for plain error. *See, e.g.*, *United States v. A.B.*, 529 F.3d 1275, 1279 n.4 (10th Cir.) ("We have repeatedly declined to allow parties to assert for the first time on appeal legal theories not raised before the district court, even when they fall under the same general rubric as an argument presented to the district court."), *cert. denied*, 129 S. Ct. 440 (2008).

Under the rigorous plain error standard, Mr. Wardell cannot prevail. The four-part plain error standard is familiar. Under this standard, we may reverse a district court's ruling "only if [the defendant] demonstrates (1) error (2) that is plain and (3) that affected her substantial rights. If these three elements are met, then we may, in our discretion, correct an error that seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Jones*, 530 F.3d 1292, 1298 (10th Cir.) (citations and internal quotation marks omitted), *cert. denied*, 129 S. Ct. 583 (2008). Even assuming *arguendo*, when evaluated in the light of the psychological-impact argument, the district court's decision to order Mr. Wardell to wear a stun belt was error, Mr. Wardell cannot establish that such error is plain—that is, obvious and clear. *See, e.g.*, *United States v. Edgar*, 348 F.3d 867, 871 (10th Cir. 2003) (noting that "[e]rror is plain if it is obvious or

---

[14](...continued)
stake out his opposition to a trial court's ruling on pain of forfeiting any right subsequently to complain.").

clear" (citation and internal quotation marks omitted)).  Generally speaking, we do not deem an error to be obvious and clear unless it is contrary to current "well-settled law"—that is, to the current law of the Supreme Court or the Tenth Circuit.  *United States v. Taylor*, 514 F.3d 1092, 1100 (10th Cir. 2008); *see Dazey*, 403 F.3d at 1175 (applying the plain error standard and noting that "[t]he district court sentenced Mr. Dazey in accordance with law that was well-settled at the time, which we know now was in error"); *United States v. Ruiz-Gea*, 340 F.3d 1181, 1187 (10th Cir. 2003) ("In general, for an error to be contrary to well-settled law, either the Supreme Court or this court must have addressed the issue.").

Mr. Wardell does not identify any Supreme Court or Tenth Circuit decisions that have addressed the psychological-impact argument relative to the mandated use of stun belts, much less any decisions from these two courts that indicate that the district court's stun-belt order was error on psychological-impact grounds, and we are not aware of any such decisions.  Accordingly, the district court's assumed error in ordering Mr. Wardell to wear a stun belt was not obvious and clear.  *See, e.g.*, *United States v. Poe*, 556 F.3d 1113, 1129 (10th Cir.) (holding that plain error standard not satisfied, stating that "[defendant] has pointed to no Supreme Court or Tenth Circuit decisions directly addressing the Guidelines issue he raises, nor do we know of any"), *cert. denied*, 130 S. Ct. 395 (2009).  Concerning his psychological-impact argument, Mr. Wardell therefore

34

has not demonstrated his entitlement to relief under the rigorous plain error standard.[15]

In summary, we are sensitive to the potential for prejudice that accompanies the compulsory use of a stun belt at trial. Nonetheless, we cannot conclude that the district court abused its discretion under controlling precedent. The district court appropriately justified the measure through the articulation of defendant-specific security concerns, and it minimized the risk of prejudice, after considering the unacceptability of other, more visible measures. And there is no current well-settled law that would support Mr. Wardell's stun-belt objection based upon detrimental psychological impact under plain error review.

## IV. Severance

Prior to trial, Mr. Wardell and Mr. Pursley filed several motions to sever their trial from that of their alleged coconspirators. They claimed that severance was necessary, *inter alia*, to introduce exculpatory coconspirator testimony. The district court denied each motion. Although a final severance motion was filed

---

[15]     In one sentence in his brief, Mr. Wardell also purports to raise an Eighth Amendment challenge to the district court's stun-belt order. *See* Aplt. Supp. Pro Se Br. at 20. However, "[u]nder our precedent, this skeletal reference is insufficient to raise . . . a discrete appellate issue." *Pursley II*, 577 F.3d at 1231 n.17. Even if we were to consider his Eighth Amendment argument, because Mr. Wardell did not object to the stun-belt order on this ground before the district court, we would again be reviewing for only plain error. As with his Fifth and Sixth Amendment challenges, we would conclude relief was not warranted because any error by the district court was not obvious and clear.

35

during the trial, this motion also was denied.  Thus, Mr. Wardell and his codefendants—Mr. Shields, Mr. Templeman, and Mr. Pursley—were tried together.

"We review the district court's denial of a motion to sever for an abuse of discretion."  *United States v. Hall*, 473 F.3d 1295, 1302 (10th Cir. 2007).  Rule 8(b) of the Federal Rules of Criminal Procedure permits an indictment to charge two or more defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b).  This rule expresses the "preference in the federal system for joint trials of defendants who are indicted together."  *Zafiro v. United States*, 506 U.S. 534, 537 (1993); *see United States v. Zapata*, 546 F.3d 1179, 1191 (10th Cir.) ("Joint trials of defendants who are charged together are preferred because they promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." (internal quotation marks omitted)), *cert. denied*, 129 S. Ct. 772 (2008), *and cert. denied sub nom.*, 129 S. Ct. 2069 (2009).  Pursuant to Rule 14(a), however, a court "may" sever the trial of more than one defendant if joinder "appears to prejudice a defendant or the government."  Fed. R. Crim. P. 14(a).

A defendant seeking to vacate a conviction based upon the denial of a motion to sever nonetheless faces a steep challenge.  As an initial matter, we recognize a presumption in a conspiracy trial that coconspirators charged together

36

should be tried together. *United States v. Stiger*, 413 F.3d 1185, 1197 (10th Cir. 2005). Furthermore, because severance is a matter of discretion, a defendant bears the "heavy burden" of showing "real prejudice." *United States v. McConnell*, 749 F.2d 1441, 1444 (10th Cir. 1984); *see United States v. Caldwell*, 560 F.3d 1214, 1221 (10th Cir. 2009) (noting that "Rule 14(a)'s prejudice standard requires a showing of actual prejudice"). "Prejudice occurs when there is a serious risk that a joint trial will compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Stiger*, 413 F.3d at 1197; *see Zapata*, 546 F.3d at 1191.

To determine whether the district court abused its discretion in denying a severance motion, we evaluate the following, non-exhaustive list of factors (the "*McConnell* factors"):

> 1) the likelihood that the co-defendant would in fact testify at the movant's severed trial and waive his Fifth Amendment privilege; 2) the significance of the testimony in relation to the defendant's theory of defense; 3) the exculpatory nature and effect of such testimony; 4) the likelihood that the co-defendant's testimony would be impeached; 5) the extent of prejudice caused by the absence of the testimony; 6) the effect of a severance on judicial administration and economy; [and] 7) the timeliness of the motion.

*McConnell*, 749 F.2d at 1445; *see also Hall*, 473 F.3d at 1302. The *McConnell* factors support the district court's denial of each of Mr. Wardell's severance motions.

37

## A. Early Severance Motions

Several months prior to trial, Mr. Wardell filed a motion to sever. Mr. Pursley joined this motion. Mr. Wardell later amended his motion and Mr. Pursley continued his joinder. The amended motion argued, *inter alia*, that "[i]n a joint trial, Messrs. Shields and Templeman would be forced to invoke their Fifth Amendment rights against self-incrimination." R., Vol. 1, Doc. 151, at 7 (Def. Wardell's Mot. to Sever (Amended), dated Oct. 31, 2005). At a severed trial, however, Mr. Shields and Mr. Templeman (according to Mr. Wardell) would testify that Mr. Pursley and Mr. Wardell did not identify Mr. Cluff as a "rat" and that Mr. Pursley and Mr. Wardell did not instruct them to assault Mr. Cluff. The district court denied Mr. Wardell's amended motion.

In considering this severance ruling in the context of Mr. Pursley's appeal, we addressed and rejected an argument essentially identical to the one Mr. Wardell presents here. *See Pursley II*, 577 F.3d at 1215-16. There, we concluded that the district court properly applied the *McConnell* factors, principally basing our decision on the *absence*, at the time the motions were filed, of affidavits from Mr. Shields and Mr. Templeman validating Mr. Wardell's assertions—that is, indicating their intention to invoke their Fifth Amendment privilege in a joint trial, stating that they would testify in a severed trial, and identifying the exculpatory content of their testimony. *Id.* On this severance issue, Mr. Pursley is "identically situated" to Mr. Wardell; accordingly, we consider our prior ruling

38

upholding the district court to be binding upon us here as law of the case. *United States v. Parada*, 577 F.3d 1275, 1279-80 (10th Cir. 2009); *see LaHue*, 261 F.3d at 1010; *United States v. Corrado*, 227 F.3d 528, 533 (6th Cir. 2000) (applying law-of-the-case doctrine to decide legal challenges previously considered and rejected during codefendant's appeal); *United States v. Schaff*, 948 F.2d 501, 506 (9th Cir. 1991) ("We have previously found the law of the case doctrine to be applicable when the appeal of one co-defendant is decided prior to the appeal of the other co-defendant, if both were convicted at the same trial."). Therefore, viewing our prior severance ruling in *Pursley II* as controlling, we reject Mr. Wardell's argument.

Another contention that Mr. Wardell raised in his first severance motion and that he presses on appeal is that he was prejudiced by the disparity between the incriminating evidence against him, on the one hand, and against Mr. Shields and Mr. Templeman, on the other. Mr. Wardell's argument is without merit. We recognize the Supreme Court's declaration that a risk of prejudice "might occur" when prejudicial evidence that would be inadmissible against a defendant, if tried alone, is admitted against a codefendant in a joint trial. *Zafiro*, 506 U.S. at 539. We also acknowledge that such a risk may be "heightened" when "many defendants are tried together in a complex case and they have markedly different degrees of culpability." *Id.* Nonetheless, the nearly insuperable rule in this circuit is that "a defendant cannot obtain severance simply by showing that the

evidence against a co-defendant is more damaging than the evidence against herself." *Dazey*, 403 F.3d at 1165; *see also Caldwell*, 560 F.3d at 1221 ("Rule 14(a)'s prejudice standard requires a showing of actual prejudice, which is not satisfied merely by pointing to a 'negative spill-over effect from damaging evidence presented against codefendants.'" (quoting *United States v. Wacker*, 72 F.3d 1453, 1468 (10th Cir. 1995))); *Hack*, 782 F.2d at 871 ("[A] mere disparity in the evidence from a quantitative standpoint against each defendant in a conspiracy case, without more, provides no justification for severance.").

Mr. Wardell's prosecution did not constitute an extraordinary instance where prejudice would have been manifested from evidentiary and culpability disparities. Mr. Wardell was charged with the same offenses—conspiracy to retaliate against a witness and retaliation against a witness—as his codefendants. The charges stemmed from the same nucleus of facts, and the government proved each charge against each defendant through interrelated evidence. *See United States v. Rodriguez-Aguirre*, 108 F.3d 1228, 1234 (10th Cir. 1997) (finding that the denial of defendant's motion to sever was proper when the charges involved a common scheme and the evidence was "massive and interrelated"). Indeed, the evidence about which Mr. Wardell complains—evidence pertaining to the actual commission of the assault by Mr. Shields and Mr. Templeman—would have been admissible against him in his own trial, as proof of an overt act in furtherance of the conspiracy. *See United States v. Cardall*, 885 F.2d 656, 668 (10th Cir. 1989)

40

(holding that there was no prejudice when evidence complained of would have been admissible against defendant in separate trial).

The district court also took steps to minimize any spill-over prejudice. The district court instructed the jury to give separate and individual consideration to each charge against each defendant. *See Hack*, 782 F.2d at 871 (holding that the district court did not abuse its discretion in denying the defendant's request for severance because the district court nullified any prejudicial error when it repeatedly admonished the jury throughout the trial to consider the evidence only against the defendant to whom it related and at the end of trial gave the jury instructions that admonished the jury to consider separately each offense and evidence in support of each offense). Although Mr. Wardell complains that the jury impermissibly attributed to him the far more damaging actions and statements of his coconspirators, the district court cautioned the jury that acts or statements, which may have been performed or made "outside the presence of a defendant and even done or said without the defendant's knowledge, . . . should be examined with particular care by [the jury] before considering them against a defendant who did not do the particular act or make the particular statement." Dist. Ct., No. 05-342, Doc. 607, at 30 (D. Colo.) (Jury Instructions, dated Dec. 12, 2005).

These measures negated any risk of prejudice. *See Zafiro*, 506 U.S. at 539 ("[L]ess drastic measures, such as limiting instructions, often will suffice to cure

41

any risk of prejudice."); *Dazey,* 403 F.3d at 1165 (finding that no severance was required in a complex, multi-defendant trial because the "jury was appropriately instructed that each count was a separate crime and that they were to consider the culpability of each defendant separately"); *Cardall*, 885 F.2d at 668 ("We believe that the trial court properly admonished the jury and, likewise, that the jury properly fulfilled its task."). Put simply, the district court correctly applied the general rule that disparity in evidence, and in culpability, does not mandate severance in a conspiracy trial involving overlapping facts and proof. *See United States v. Ray*, 370 F.3d 1039, 1045 (10th Cir. 2004) (applying rule even when government introduced evidence of murder and torture by alleged coconspirators in complex, 23-day trial involving drug conspiracy charges), *vacated in part on other grounds*, 543 U.S. 1109 (2005); *United States v. Emmons*, 24 F.3d 1210, 1218-19 (10th Cir. 1994) (applying rule).

## B. Renewed Severance Motion

Mr. Wardell and Mr. Pursley filed a renewed motion to sever one business day before trial. The renewed motion provided declarations from Mr. Templeman and Mr. Shields stating that: (1) they would testify if Mr. Wardell's trial was severed from their trial, but would not testify in a joint trial; (2) they did not "conspire" with Mr. Wardell or Mr. Pursley; and (3) they were never "instruct[ed]" by Mr. Wardell or Mr. Pursley "to physically assault Jess[i]e Cluff." R., Vol. II, Doc. 316, at 5-6 (Pursley and Wardell's Renewed Mot. To

42

Sever, dated Dec. 2, 2005).

We rejected the challenge of Mr. Wardell's codefendant, Mr. Pursley, to the district court's denial of the renewed severance motion. *Pursley II*, 577 F.3d at 1216-19. More specifically, we held that the district court did not abuse its discretion and that it properly applied the *McConnell* factors. *Id.* at 1216. In particular, the district court reasonably determined that the proposed testimony lacked the requisite substance to generate prejudice and that administrative considerations relating to the late filing of the severance motion—one business day before trial—also supported the district court's decision. *Id.* at 1216, 1218-19. Our ruling in *Pursley II* is law of the case here. *See, e.g.*, *LaHue*, 261 F.3d at 1010. On that basis, we reject Mr. Wardell's challenge to the district court's denial of his renewed severance motion.

## C. Severance Motions Filed During Trial

On the last day of witness testimony, Mr. Wardell and Mr. Pursley filed their final motion to sever. This motion provided new, somewhat more expansive declarations from Mr. Shields and Mr. Templeman. For the most part, each declaration identified specific inculpatory statements that Mr. Cluff and Mr. Hoskins—an inmate who was in Mr. Wardell's cell at the time of the assault—attributed to Mr. Wardell and Mr. Pursley. Mr. Shields and Mr. Templeman then indicated that upon severance they would testify that neither Mr. Wardell nor Mr. Pursley made any such statements on the day of the assault.

Again, the district court denied this motion. In *Pursley II*, we held that the district court did not abuse its discretion in doing so. *Pursley II*, 577 F.3d at 1219. We are bound by that ruling here under the law of the case doctrine. *See, e.g.*, *LaHue*, 261 F.3d at 1010.

## V. Sentencing

Mr. Wardell argues that the district court lacked a factual basis to apply two sentencing adjustments—an adjustment for causing physical injury with the purpose of obstructing the administration of justice, pursuant to U.S.S.G. § 2J1.2(b)(1)(A), and a leader or organizer adjustment, pursuant to U.S.S.G. § 3B1.1(c). We reject both challenges.

At sentencing, the district court overruled Mr. Wardell's objections to the applicability of these two adjustments, adopting the PSR's reasoning and the government's sentencing statement. The district court also found that the factual predicates for the § 2J1.2(b)(1)(A) and § 3B1.1(c) adjustments "were resolved against the defendant at trial, either by the court or by the jury, and . . . are supported by at least a preponderance of the evidence." R., Vol. XVII, Tr. at 22 (Sentencing Hearing, dated Mar. 17, 2006). Mr. Wardell's contentions constitute challenges to the procedural reasonableness of his sentence—the calculation of his Guidelines range. *See United States v. Huckins*, 529 F.3d 1312, 1317 (10th Cir. 2008) (noting that procedural reasonableness relates to, *inter alia*, "whether the district court incorrectly calculated or failed to calculate the Guidelines

44

sentence"); *United States v. Kristl*, 437 F.3d 1050, 1054-55 (10th Cir. 2006) ("A

sentence cannot, therefore, be considered reasonable if the manner in which it was

determined was unreasonable, i.e., if it was based on an improper determination

of the applicable Guidelines range."). In determining the propriety of such

calculations, we review legal questions de novo and factual findings for clear

error. *United States v. Apperson*, 441 F.3d 1162, 1210 (10th Cir. 2006).

## A. Obstruction-of-Justice Adjustment

Section 2J1.2(b)(1)(A) of the Guidelines provides for an eight-level

increase in a defendant's offense level if the offense involved causing or

threatening to cause physical injury to a person or property damage in order to

obstruct the administration of justice. The commentary in the Guidelines lists 18

U.S.C. § 1513 as one of the statutes to which the adjustment applies, and it

expressly states that the eight-level adjustment is applicable to an offense that

involves "bodily injury or property damage in retaliation for providing testimony,

information or evidence in a federal proceeding." U.S.S.G. § 2J1.2 cmt. statutory

provisions, background; *see also United States v. Calvert*, 511 F.3d 1237, 1243

(9th Cir. 2008) ("The placement of certain prohibited acts in this chapter [73 of

title 18, including § 1513] strongly indicates that the intent to commit such an act

amounts to an intent to obstruct justice."); *United States v. Gallimore*, 491 F.3d

871, 876 (8th Cir. 2007) ("It is apparent from the guidelines and commentary that

the Sentencing Commission was concerned that retaliation against a witness for

45

past testimony was likely to interfere with the effective administration of justice." (footnote omitted)).

Our focus here is on the district court's factual determination that Mr. Wardell's conduct warrants the adjustment. Accordingly, we review for clear error. *See United States v. Voss*, 82 F.3d 1521, 1532 (10th Cir. 1996) (reviewing obstruction adjustment under U.S.S.G. § 2J.1.2(b)(2) concerning "substantial interference with the administration of justice," and noting "[t]he district court's decision raises factual questions that we review for clear error"); *cf. United States v. Hankins*, 127 F.3d 932, 934 (10th Cir. 1997) (assessing obstruction of justice adjustment under U.S.S.G. § 3C1.1 and noting that "we review the district court's factual determinations concerning the obstruction of justice enhancement for clear error only"); *cf. also Calvert*, 511 F.3d at 1240-41 (noting where defendant argued that obstruction of justice enhancement of § 2J1.2 did not apply "[w]ithout the existence of some *pending* judicial proceeding at the moment of retaliation" that defendant "challenges only the district court's interpretation of the Guidelines in calculating his sentence, a question which we review *de novo*").

The district court did not clearly err in applying the adjustment. Mr. Wardell was convicted of conspiracy to retaliate against a witness and actual retaliation against a witness. Given the evidence before it, in convicting Mr. Wardell of the § 1513(b)(1) offense, the jury necessarily found the factual prerequisite for the adjustment—that Mr. Wardell knowingly threatened to and, in

46

fact, did cause Mr. Cluff to suffer bodily injury because Mr. Cluff testified against Mr. Wardell in the tax-fraud case. Accordingly, the district court could reasonably apply the adjustment to Mr. Wardell. *See United States v. Smith*, 387 F.3d 826, 831 (9th Cir. 2004) (noting that the jury's findings in convicting defendant under § 1513(b)(2) for threatening to cause bodily injury to witness with intent to retaliate "provide[d] adequate support for the § 2J1.2(b)(1) offense level increase"); *United States v. Levy*, 250 F.3d 1015, 1017-18 (6th Cir. 2001) (affirming § 2J1.2(b)(1) adjustment when defendant convicted under § 1513(b)).

Indeed, Mr. Wardell endorses this analysis by negative implication. He rests his entire challenge on the ostensible success of his sufficiency-of-the-evidence challenges. Mr. Wardell argues that, "[i]n as much as the Government failed to establish the existence of a conspiracy at trial, . . . it was error for the court to impute Jessie Cluff's beating to Mr. Wardell, and thus adjust his offense level upward to reflect this physical damage." Aplt. Br. at 33. But we already have rejected Mr. Wardell's sufficiency-of-the-evidence challenges. Therefore, under the logic of his own argument, Mr. Wardell's attack on the district court's application of the § 2J1.2(b)(1)(A) adjustment must fail. In any event, we conclude that the district court did not clearly err in applying the adjustment.

## B. Leader or Organizer Adjustment

The district court found Mr. Wardell to be an "organizer *and* leader" within the meaning of U.S.S.G. § 3B1.1(c). R., Vol. XVII, Tr. at 23 (emphasis added).

47

Because a defendant's status as an organizer or leader involves a sophisticated factual determination, we review the district court's finding and its application of this adjustment to Mr. Wardell for clear error. *See United States v. Wilfong*, 475 F.3d 1214, 1218 (10th Cir. 2007); *United States v. Cruz Camacho*, 137 F.3d 1220, 1223-24 (10th Cir. 1998). Under this standard, we uphold the district court's application of the upward adjustment.

A two-level adjustment under § 3B1.1(c) applies whenever "the defendant was an organizer, leader, manager, or supervisor in any criminal activity [involving less than five participants and that is not otherwise extensive]." U.S.S.G. § 3B1.1(c). Functioning as a leader requires an element of control over underlings, particularly in the form of recruitment and direction. *See Cruz Camacho*, 137 F.3d at 1224-25 (finding the defendant had a "leadership role" when the defendant recruited and directed coconspirators). To qualify as an organizer, however, no control is necessary. *United States v. Egbert*, 562 F.3d 1092, 1103 (10th Cir. 2009); *United States v. Valdez-Arieta*, 127 F.3d 1267, 1272 (10th Cir. 1997); *see also United States v. Tejada-Beltran*, 50 F.3d 105, 112 (1st Cir. 1995) (noting that the "disjunctive usage" of leader or organizer "cannot be written off as linguistic happenstance" and that "[w]hile the term 'leader' implies the exercise of some degree of dominance or power in a hierarchy, and also implies the authority to ensure that other persons will heed commands . . . the term 'organizer' has a different connotation"). Instead, a defendant may be

48

deemed an organizer under § 3B1.1 for "devising a criminal scheme, providing the wherewithal to accomplish the criminal objective, and coordinating and overseeing the implementation of the conspiracy even though the defendant may not have any hierarchical control over the other participants." *Valdez-Arieta*, 127 F.3d at 1272; *see also Tejada-Beltran*, 50 F.3d at 112 ("The key to determining whether a defendant qualifies as an organizer is not direct control but relative responsibility.").

The district court's finding that Mr. Wardell was an organizer was not clearly erroneous. Therefore, we need not (and do not) opine on the propriety of the district court's distinct finding that Mr. Wardell also was a leader. *See United States v. Tagore*, 158 F.3d 1124, 1131 & n.5 (10th Cir. 1998) (declining to address appellant's argument contesting role as leader of conspiracy after finding defendant to be organizer).

Although the district court did not provide a detailed analysis, its ultimate factual conclusion represents a permissible view of the evidence presented at trial and outlined in the PSR. Consistent with the jury's verdict, that evidence established—at the very least, by a preponderance—that Mr. Wardell conspired with Mr. Pursley (a) to encourage Mr. Shields and Mr. Templeman to participate in an assault on Mr. Cluff, (b) to secure their presence in a location where they could carry out the assault, (c) to counsel them on when to start the assault, and

49

(d) to engage in noise-making conduct to help ensure the assault's successful completion.

More specifically, Mr. Cluff testified that Mr. Wardell repeatedly attempted to deter him from testifying in the tax-fraud case. When these efforts proved unsuccessful, Mr. Wardell worked with Mr. Pursley to enlist Mr. Cluff's eventual attackers, Messrs. Shields and Templeman. Mr. Wardell falsely identified the two men as witnesses on his behalf in the tax-fraud case and along with Mr. Pursley caused a writ to be issued to bring about their transfer to the courthouse. During an apparently planned encounter with Mr. Shields on a prisoner transfer bus, Mr. Wardell participated (albeit to a limited extent) along with Mr. Pursley in a furtive, whispered conversation with Mr. Shields. Subsequently, Mr. Wardell actively coordinated with Mr. Pursley a subterfuge involving the making of loud noises to conceal and effectuate the assault on Mr. Cluff—a scheme to muffle his screams of pain and pleas for help. Following the assault, Mr. Wardell effectively confirmed his organizational role by telling Mr. Cluff "[t]hat's what you get, you fucking rat." R., Vol. XII, Tr. at 472 (internal quotation marks omitted).

To be sure, Mr. Pursley also was responsible for coordinating the conspiracy and was probably more responsible for the planning than Mr. Wardell. Nonetheless, more than one person in a conspiracy can qualify under the

50

Guidelines as an organizer. U.S.S.G. § 3B1.1 cmt. n.4; *see, e.g.*, *United States v. Johnson-Dix*, 54 F.3d 1295, 1310 (7th Cir. 1995) (noting that "it is clear that the enhancement may apply to more than one person in any criminal organization"). The evidence supporting the district court's factual determination is consonant with the evidence found in other judicial decisions applying the organizer adjustment. *See, e.g.*, *United States v. Brown*, 315 F.3d 929, 932 (8th Cir. 2003) (affirming adjustment under § 3B1.1(c) for "organizing the criminal activity" when defendant recruited retail clerk in advance to pass off counterfeit bills and compensated clerk after transaction); *Valdez-Arieta*, 127 F.3d at 1272-73 (affirming organizer adjustment under § 3B1.1(c) when defendant provided sources to supply drugs, directed suppliers to deliver particular drugs, and decided on financial arrangements concerning deliveries); *United States v. Williams*, 894 F.2d 208, 214 (6th Cir. 1990) (holding that evidence was sufficient to support two-level organizer adjustment, where defendant admitted to undercover officer that it was his fault that earlier cocaine transaction had fallen through, negotiated meeting through phone calls he initiated, and personally delivered cocaine to officer, although defendant obtained cocaine he was going to sell from another source); *cf. United States v. Katora*, 981 F.2d 1398, 1402-03 (3d Cir. 1992) (reversing organizer adjustment and commenting that "the district court's findings indicate that [the defendants] were 'organizers' only in the sense that they were 'planners' of the offense" and that § 3B1.1 does not contemplate

51

that district courts will "enhance the sentences of a duo when they bear equal responsibility for 'organizing' *their own commission of a crime*." (emphasis added)).

Citing no case law, Mr. Wardell argues that the adjustment was inappropriate because "the Government never concretely showed such *leadership* in its case in chief." Aplt. Br. at 33 (emphasis added). At most, according to Mr. Wardell, "the conduct summarized at Mr. Wardell's sentencing hearing [was] part and parcel of a tangential affiliation with the putative conspiracy." *Id.* For at least two reasons, however, Mr. Wardell's argument fails. First, as noted, we only need to reach the district court's organizer finding to resolve this case. *See Tagore*, 158 F.3d at 1131. And Mr. Wardell's argument as to that finding (as opposed to the leader finding) is essentially nonexistent. Second, Mr. Wardell's characterization of the evidence that was before the district court is mistaken. As outlined above, this evidence did far more than establish a tangential relationship of Mr. Wardell to the conspiracy to assault Mr. Cluff; it defined Mr. Wardell as an active participant in devising the criminal scheme and coordinating its objective (i.e., the Cluff assault). As such, it clearly was sufficient evidence to support the district court's organizer finding.

## VI. Additional Issues Briefed by Mr. Wardell in His Pro Se Capacity

In addition to the stun belt contention discussed above, acting pro se, Mr. Wardell presents numerous other contentions of error. With one exception, we need not give these contentions more than summary treatment; they are wholly

52

lacking in merit and we reject them.[16]  The exception relates to Mr. Wardell's

---

[16]      We reach our conclusion to reject these contentions after thorough consideration of the record and the relevant legal authorities, including our recent decision involving the appellate challenges of Mr. Wardell's codefendant, Mr. Pursley.  Some of Mr. Wardell's pro se contentions are foreclosed under the law of the case doctrine by that decision. For example, Mr. Wardell argues that the district court erroneously admitted Mr. Cluff's out-of-court statements as excited utterances under Fed. R. Evid. 803(2) and that their admission also was in violation of the Sixth Amendment's Confrontation Clause.  In *Pursley II*, we concluded that the district court did not err in finding that the statements were excited utterances.  *Pursley II*, 577 F.3d at 1219-22.  Although contrary to the district court's view, we held that the statements were not thereby immune from Confrontation Clause challenge.  *Id.* at 1222-24.  Nonetheless, we determined that their admission in this case did not give rise to a Confrontation Clause violation because Mr. Cluff was available for cross-examination (i.e., there was an opportunity to confront him).  *Id.* at 1224-25.  Our analysis and rulings in *Pursley II* apply with full force to Mr. Wardell's arguments and are law of the case, *see, e.g.*, *LaHue*, 261 F.3d at 1010.  Therefore, his contentions of error concerning the admission of Mr. Cluff's out-of-court statements must fail.  Similarly, Mr. Wardell challenges the admission of a portion of the opening statement from the tax-fraud trial during which Mr. Pursley's counsel refers to Mr. Cluff as the government's "star witness." *See Pursley II*, 577 F.3d at 1225-26.  In disposing of Mr. Pursley's appeal, although assuming *arguendo* that there was error in the admission of the exhibit, we ultimately rejected his challenge, holding that any such error was harmless.  *Id*. at 1226-27.  We can see no reason why that ruling should not bind us here as law of the case.  Furthermore, other contentions of error advanced by Mr. Wardell are patently frivolous.  For instance, he contends that the district court judge should have recused because *inter alia* federal marshals testified during the trial and they also "provide security" to the district judge and the "assault occurred in the very same courthouse where the district judge works."  Aplt. Supp. Pro Se Br. at 41.  Under 28 U.S.C. § 455(a), "[a]ny justice, judge or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  28 U.S.C. § 455(a).  Judicial recusal is required "if a reasonable person, knowing all the circumstances, would expect that the judge would have actual knowledge of his interest or bias in the case." *Sao Paulo State of the Federative Republic of Braz. v. Am. Tobacco Co.*, 535 U.S. 229, 233 (2002) (alterations, emphasis and internal quotation marks omitted).  Mr. Wardell's recusal contentions do not even begin to satisfy this standard.  Likewise, Mr. Wardell argues that the jury was not

(continued...)

53

instructed to consider the guilt of Mr. Wardell and Mr. Pursley separately and individually and the court's instructions, which purported to offer clarifying remarks to the jury in response to a question regarding the elements of the conspiracy offense, caused the jury to view Mr. Wardell and Mr. Pursley as a unit for purposes of determining guilt.  At bottom, however, Mr. Wardell really takes exception to the idea that conspirators can be held responsible for overt acts of their coconspirators undertaken in furtherance of the conspiracy.  However, that has long been settled law.  *Compare United States v. Carnagie*, 533 F.3d 1231, 1243 (10th Cir. 2008) ("But the government did not have to prove that *he* [the defendant] committed an overt act, so long as it proved he conspired with Mr. Williams and other real estate agents and one of them committed an overt act in furtherance of the conspiracy."), *cert. denied*, 129 S. Ct. 1366 (2009), *and cert. denied sub nom.*, 129 S. Ct. 1385 (2009), *with United States v. Gonzalez*, 797 F.2d 915, 916-17 (10th Cir. 1986) ("Once any conspirator commits such an overt act, the crime of conspiracy is complete; and no member of the conspiracy can withdraw from that crime.").  Indeed, Mr. Wardell should be quite familiar with that vicarious liability principle based upon his experience in the tax-fraud prosecution.  *United States v. Pursley*, 474 F.3d 757, 768 (10th Cir. 2007) ("Nor would it be necessary to prove he [codefendant Pursley] performed overt acts in furtherance of each aspect of the conspiracy so long as the government sufficiently proved that he conspired with Wardell in the tax fraud scheme and *at least one of them* engaged in one overt act." (emphasis added)). Furthermore, based upon our review of the record, we conclude that the district court properly instructed the jury to consider the guilt of Mr. Wardell and Mr. Pursley individually but, to the extent that it found that they had entered into an unlawful agreement to retaliate against Mr. Cluff, properly informed the jury of vicarious liability principles relevant to the jury's determination of their guilt of the conspiracy offense.  We also note that Mr. Wardell makes a cumulative error argument, contending that the individual errors that he and his codefendant, Mr. Pursley have raised, even if individually harmless, "in the aggregate show the absence of a fair trial."  Aplt. Supp. Pro Se Br. at 98; *see generally United States v. Rogers*, 556 F.3d at 1144 (noting that "[t]he purpose of cumulative error analysis 'is to address whether the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error.'" (quoting *United States v. Harlow*, 444 F.3d 1255, 1269 (10th Cir. 2006)).  First, Mr. Wardell cannot benefit in this analysis from any errors argued by Mr. Pursley *unless* Mr. Wardell also has argued them in his appeal.  Second, even assuming *arguendo*, as we have *infra*, that the district court

(continued...)

54

argument concerning the district court's rulings on his subpoena requests.  In part,

that argument justifies more extended consideration.[17]  Notably, Mr. Wardell

_____

[16](...continued)
erred in handling the necessity inquiry regarding Mr. Wardell's subpoena requests
under Rule 17(b), we cannot conceive of any prejudice that Mr. Wardell has
suffered and he has not made any meaningful showing of prejudice.  And, in light
of the ample evidence of Mr. Wardell's guilt, any such prejudice would not have
affected his substantial rights and rendered his trial unfair.  *Id.*  ("We determine
whether cumulative error is harmless by conducting the same inquiry as for
individual error—courts look to see whether the defendant's substantial rights
were affected." (internal quotation marks omitted)).  In sum, after carefully
considering all of them, we may confidently reject in summary fashion most of
Mr. Wardell's pro se contentions.

[17]       Mr. Wardell argues that the district court abused its discretion by
denying his subpoena requests for certain witnesses.  We may dispose of that
argument with limited discussion.  We previously rejected a challenge by Mr.
Wardell's codefendant, Mr. Pursley, to the district court's denial of his subpoena
requests.  Mr. Wardell represented to the district court that he sought to subpoena
the same witnesses as Mr. Pursley.  *See* R., Vol. XII, Tr. at 621 (Mr. Wardell
stating, "Just to advise the court, I believe the ones I filed were mirror images of
Mr. Pursley's").  In rejecting Mr. Pursley's challenge, we concluded that the
district court reasonably found that Mr. Pursley's motion for issuance of the
subpoenas was defective under Rule 17(b), *inter alia*, because it failed to
establish the necessity for the witnesses' testimony for an adequate defense.
*Pursley II*, 577 F.3d at 1229-32.  Similarly, we determined that, when the district
court gave Mr. Pursley a subsequent opportunity in open court to demonstrate
such necessity, he failed to do so.  *Id.* at 1231-32.  Accordingly, we concluded
that the district court did not abuse its discretion in denying Mr. Pursley's
subpoena requests.  *Id*. at 1230-32.

        Our rulings and reasoning in *Pursley II* foreclose Mr. Wardell's challenge
to the district court's discretionary denial of his subpoena requests.  Regarding
their motions, Messrs. Pursley and Wardell were effectively in the same position.
Mr. Wardell's motion was a little more detailed than Mr. Pursley's in that he at
least named some of the witnesses for whom he desired subpoenas.  *See Pursley
II*, 577 F.3d at 1230 & n.16.  But the district court had permitted Mr. Pursely to
join Mr. Wardell's subpoena request motion.  *Id.*; *see* R., Vol. III, Doc. 359, at 1

(continued...)

specifically asserts that the procedure the district court employed in inquiring into his necessity rationale for issuing the subpoenas violated the ex parte prescriptions of Rule 17(b).

"The refusal to issue a subpoena pursuant to Rule 17(b) is reviewed for an abuse of discretion." *Pursely II*, 577 F.3d at 1229. That means "we consider the circumstances and correctness" of the district court's rulings regarding the issuance of particular subpoenas "under the abuse of discretion standard." *United States v. Greschner*, 802 F.2d 373, 378 (10th Cir. 1986). However, the inquiry here relates to whether the procedure that the district court used to elicit the necessity information—quite apart from the merits of any particular subpoena request or set of subpoena requests—itself effected a violation of Rule 17(b)'s terms. That inquiry seemingly presents a legal question that we would review de novo. *Cf. id.* at 379 (tacitly applying de novo review to the question of whether

---

[17](...continued)
n.2 (dated Dec. 7, 2005). Therefore, the district court's finding that the contents of Mr. Pursley's motion were legally deficient was effectively a ruling also on the contents of Mr. Wardell's motion. We treat that ruling as law of the case. *See, e.g.*, *LaHue*, 261 F.3d at 1010. Moreover, when the district court subsequently gave Mr. Wardell and Mr. Pursley an opportunity in open court to make a necessity showing, Mr. Wardell relied upon Mr. Pursley to advocate the necessity cause. Although he briefly addressed the court on a few occasions, Mr. Wardell offered nothing material on the necessity issue. Accordingly, our conclusion in *Pursley II*, that the district court reasonably determined that the requisite necessity showing also was not made orally applies with full force to Mr. Wardell. Because the two men were "identically situated," we deem this ruling to be binding law of the case. *Parada*, 577 F.3d at 1279-80.

the district court's conduct violated Rule 17(b)'s "require[ment] [that] trial courts

consider the motions *ex parte*"); *cf. also United States v. Friday*, 525 F.3d 938,

948 (10th Cir. 2008) ("Ordinarily, a district court's order dismissing an

indictment is reviewed for abuse of discretion, but if the dismissal is based on the

court's interpretation of governing statutes, we review it de novo." (internal

quotation marks omitted)), *cert. denied*, 129 S. Ct. 1312 (2009); *Sac and Fox*

*Nation of Mo. v. Norton*, 240 F.3d 1250, 1258 (10th Cir. 2001) (noting that a

district court's necessary or indispensable parties rulings under Fed. R. Civ. P. 19

ordinarily are reviewed for an abuse of discretion but "[a]ny legal conclusions

underlying a district court's Rule 19 determinations, however, are reviewed de

novo"); *United States v. Gutierrez-Gonzalez*, 184 F.3d 1160, 1164 (10th Cir.

1999) ("Generally, a district court's grant of a motion in limine is reviewed for

abuse of discretion.  However, in granting the government's motion in limine, the

district court reached the legal conclusion that . . . entrapment by estoppel was

not a permissible defense as a matter of law. . . .  We therefore review de novo

th[at] district court[] decision . . . ." (citations omitted)).  Ultimately, however,

we need not definitively opine on which of those two standards (i.e., abuse of

discretion or de novo) should apply to Mr. Wardell's procedural challenge; as we

explain below, we conclude that Mr. Wardell has forfeited the issue.  Therefore,

Mr. Wardell must pursue relief by running the rigorous gauntlet of plain error

review.

57

Although not extensively briefed, Mr. Wardell presents a contention of procedural error related to the district court's denial of his subpoena requests. *See* Aplt. Supp. Pro Se Br. at 95. In particular, Mr. Wardell contends that the district court erred under Rule 17(b) in making inquiries in the presence of the government concerning the defense's necessity rationale for the issuance of the subpoenas. As support for this proposition, Mr. Wardell cites the Fourth Circuit's decision in *United States v. Espinoza*, 641 F.2d 153, 158 (4th Cir. 1981), which notes that the 1966 amendment to Rule 17(b) adopted a "constitutionally unobjectionable procedure of permitting such disclosure to be made to the court ex parte, thus assuring that the government not become privy thereto."

In *Pursley II*, we "express[ed] very serious concerns regarding the approach the [district] court took in providing Mr. Pursley with another opportunity to demonstrate necessity" and indeed assumed that the approach ran afoul of our own precedent that recognizes that Rule 17(b) imposes an ex parte requirement. *Pursley II*, 577 F.3d at 1231 n.17; *see Greschner,* 802 F.2d at 379 (noting that Rule 17(b) "require[s] the trial court to consider the motions *ex parte*" and that the trial court "violated" the rule "by allowing two Government attorneys to attend the [subpoena] hearing"). Nevertheless, under the unique universe of facts found in *Pursley II*, we concluded that Mr. Pursley waived any possible appellate challenge to the court's assumed violation of Rule 17(b)'s ex parte strictures. *See Pursley II*, 577 F.3d at 1231 n.17. In particular, we noted that Mr. Pursley

58

*volunteered* to offer his necessity rationale in open court with the government present, never objected to the government's presence based on Rule 17(b), and did not present in his brief to this court a sufficiently intelligible challenge based upon this issue to preserve it. *Id.*

To a large degree, Mr. Wardell operated in tandem with Mr. Pursley in seeking approval of the subpoena requests—and, indeed, allowed Mr. Pursley to play the lead part in the endeavor. In material respects, however, Mr. Wardell is not similarly situated to Mr. Pursley with regard to the ex parte 17(b) issue. Although he did not do so in great detail, Mr. Wardell did adequately present the ex parte issue in his appellate filing. Furthermore, although he briefly engaged in a dialogue with the district court about desired witnesses (although with no appreciable effect on the merits of the necessity issue), Mr. Wardell never personally *volunteered* to make his necessity showing in the government's presence. Lastly, Mr. Wardell ultimately *did* object to the district court's necessity inquiries on ex parte Rule 17(b) grounds. *See* R., Vol. XII, Tr. at 635 ("If I can interject. Rule 17 requires *ex parte* applications, and I think we are getting a little – [government counsel] is here. I think we are entitled to *ex parte* communications."). These distinctions between the conduct of Mr. Wardell and Mr. Pursley make a difference on the Rule 17(b) issue with respect to waiver. As we noted in *Greschner*, "we must consider the possibility of waiver with caution" when defendants are proceeding pro se. *Greschner*, 802 F.2d at 380.

59

Accordingly, we conclude that Mr. Wardell (unlike Mr. Pursley) has not waived the Rule 17(b) issue.

However, that does not mean that we will review the district court's purported error under a de novo standard (or even for an abuse of discretion). In *Pursley II*, we commented in passing that Mr. Wardell's Rule 17(b) objection was "arguably untimely." *Pursley II*, 577 F.3d at 1231 n.17. Now that the matter is squarely before us, we conclude that Mr. Wardell's objection was in fact untimely. Consequently, we review under the rigorous plain error standard.

A forfeiture implicating plain error review does not just occur when a litigant completely fails to object but also when he or she "fail[s] to make the *timely* assertion of a right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (emphasis added); *see Macsenti v. Becker*, 237 F.3d 1223, 1230-31 (10th Cir. 2001) (deeming defendant's objection to be untimely and applying plain error review when defendant "did not object to the testimony when it was admitted during trial" but, rather, raised the objection "after the close of all of the evidence by a motion"); *United States v. Walsh*, 75 F.3d 1, 6 (1st Cir. 1996) ("[B]oth objections are subject to review only for plain error. It is true that both issues were raised in the trial court *after* the verdict . . . . But the usual rule is that an objection must be made known at the time that the court is making its decision to act . . . ."); *United States v. Lara-Hernandez*, 588 F.2d 272, 274 (9th Cir. 1978) (per curiam) ("Absent plain error, a conviction will not be reversed on evidentiary

grounds not revealed to the trial court at the time of the assertedly erroneous ruling, even though the omitted argument is eventually made at some later stage of the trial."); *cf. United States v. Gibbs*, 739 F.2d 838, 849, 850 & n.25 (3d Cir. 1984) (holding defendant's objection "untimely and insufficient to preserve . . . [the] issue for appeal," where defendant "made his constitutional objection *not* when the evidence was offered, but during a motion to strike made *after* the Government rested," but noting that "we are satisfied that in this instance the district court did not commit plain error" (footnote omitted)). As we noted in *Pursley II*, Mr. Wardell did not lodge his Rule 17(b) objection "until virtually all of Mr. Pursley's dialogue with the court about the purported necessity for the witnesses had taken place." *Pursley II*, 577 F.3d at 1231 n.17. Consequently, Mr. Wardell's objection was not "made known at the time that the court [wa]s making its decision to act," *Walsh*, 75 F.3d at 6, and Mr. Wardell "deprived [the government] of the opportunity," *Macsenti*, 237 F.3d at 1234, to (for example) leave the courtroom to avoid the commission of any error. In sum, Mr. Wardell's objection came too late.

Under the rigorous plain error standard, outlined in Part III *supra*, Mr. Wardell cannot prevail. Although ultimately we need not definitively decide the point, we assume that the district court erred under Rule 17(b) in conducting the open court inquiry into Mr. Wardell's necessity rationale and that the error was obvious and clear. However, Mr. Wardell has made absolutely no showing that

61

the court's approach affected his substantial rights, as he was obliged to under the third prong of plain error review. *See United States v. Meriwether*, 486 F.2d 498, 506-07 (5th Cir. 1973) (noting that "although the presence of the Assistant United States Attorney at application proceedings held under Rule 17(b) violates the rule," "to obtain a reversal of the conviction, defendant is required to show that he was prejudiced by the failure to comply with the rule," and concluding that defendant "failed to make such a showing"); *see also United States v. Hauk*, 412 F.3d 1179, 1194-95 (10th Cir. 2005) (discussing the third prong of the plain error test, which requires a showing that the alleged error affected substantial rights). For example, Mr. Wardell makes no attempt to link the denial of the subpoenas to the district court's decision to allow the government to be present. *Cf. United States v. Abreu*, 202 F.3d 386, 391 (1st Cir. 2000) (holding that the district court was "in error in not handling the entire application [for defense expert services] on an ex parte basis" and that on remand the court should hear ex parte "only new matters that counsel . . . refrained from presenting before on grounds of privilege or confidentiality" and "then reconsider whether it should grant the application"); *cf. also United States v. Gonzalez-Huerta*, 403 F.3d 727, 732-33 (10th Cir. 2005) ("Satisfying the third prong of plain-error review—that the error affects substantial rights—'usually means that the error must have affected the outcome of the district court proceedings.'" (quoting *United States v. Cotton*, 535 U.S. 625, 632 (2005)). Nor has Mr. Wardell argued that the disclosure of any facets of

62

his necessity rationale to the government hobbled him in marshaling his defense. Tellingly, even when given the opportunity to do so on appeal, Mr. Wardell has made no showing of necessity. Therefore, we are hard-pressed to see how the denial of the subpoena requests could have affected his substantial rights—*viz.*, prejudiced him. Accordingly, Mr. Wardell has not carried his burden of establishing that the district court's assumed clear and obvious error under Rule 17(b) warrants reversal. Accordingly, we reject Mr. Wardell's challenge.

## CONCLUSION

For the foregoing reasons, we reject each of Mr. Wardell's challenges on appeal. Accordingly, we **AFFIRM** the district court's judgment.[18]

---

[18] All pending motions are denied as moot.