**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 17, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

JOHN MCALLISTER HOOD,

      Defendant-Appellant.

No. 09-4156

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 1:07-CR-00078-DS-1)**

_____

Jill Wichlens, Assistant Federal Public Defender (Raymond P. Moore, Federal Public Defender, on the brief), Denver, Colorado, for Defendant-Appellant.[*]

Stephen J. Sorenson, Assistant United States Attorney (Carlie Christensen, Acting United States Attorney, with him on the brief), Salt Lake City, Utah, for Plaintiff-Appellee.

_____

Before **TYMKOVICH, SEYMOUR**, and **HOLMES**, Circuit Judges.

_____

**HOLMES**, Circuit Judge.

_____

[*]    We **GRANT** Mr. Hood's motion to substitute Assistant Federal Public Defender Jill Wichlens for Assistant Federal Public Defender Vicki Mandell-King, but note that Ms. Mandell-King argued this matter before us.

Defendant-Appellant John McAllister Hood was convicted after a jury trial of possession with intent to distribute fifty grams or more of actual methamphetamine in violation of 21 U.S.C. § 841(a)(1). Before trial, Mr. Hood had sought to dismiss the indictment against him based on the government's destruction of evidence, but the district court denied his motion. After the jury rendered its guilty verdict, Mr. Hood also challenged a document filed by the government, called a Notice of Intent to Enhance Punishment pursuant to 21 U.S.C. § 851 ("Enhancement Information"). The Enhancement Information was supposed to notify Mr. Hood of the government's intention to seek enhanced penalties for certain prior drug convictions. Mr. Hood challenged the Enhancement Information on the grounds that it contained incorrect information as to the court and place of conviction for one of his prior drug convictions. The district court rejected Mr. Hood's challenge to the Enhancement Information, granted the government's motion to correct the error contained therein, and sentenced Mr. Hood to life imprisonment pursuant to 21 U.S.C. §§ 841(b)(1)(A)(viii) and 851.

Mr. Hood now appeals, arguing: (1) the district court should have dismissed the indictment against him because the government destroyed potentially exculpatory evidence, which deprived him of due process; (2) in the alternative, the district court should have imposed sanctions on the government

for such destruction; (3) the district court should not have sentenced him to life imprisonment because the Enhancement Information contained a non-clerical, prejudicial error; and (4) based on Mr. Hood's statements about defense counsel at his sentencing hearing, the district court should have inquired sua sponte into Mr. Hood's relationship with defense counsel to investigate a possible conflict. We exercise jurisdiction under 28 U.S.C. § 1291 and **AFFIRM**.

## I. Background

Officers from the Weber-Morgan Narcotics Strike Force, a multi-jurisdictional unit based in Ogden City, Utah, arrested Stacy Wilbert on September 14, 2006. Ms. Wilbert had been working for police as a confidential informant, but they discovered she had continued to use and sell methamphetamine. Upon her arrest, Ms. Wilbert gave officers permission to search her home, where they discovered thirteen bags of methamphetamine that weighed a total of 32.2 grams. Ms. Wilbert then identified Mr. Hood as her supplier and agreed to call Mr. Hood to arrange for a drug deal.[2] In order to avoid causing Mr. Hood to become suspicious, Ms. Wilbert informed the officers that she would order the same amount of methamphetamine from Mr. Hood that "she always purchased from him." R., Vol. III, Pt. 1, at 147 (Jury Trial, dated

---

[2]     Numerous recorded conversations took place between Ms. Wilbert and Mr. Hood, but the computer files containing the recordings were accidentally erased. Although Mr. Hood challenged the destruction of that evidence in his pre-trial Motion to Dismiss, he does not challenge its destruction on appeal.

Apr. 29, 2009).  This "regular amount," *id.*, was a quarter of a pound, or approximately 113 grams.

Mr. Hood arrived at Ms. Wilbert's home carrying a backpack.  Officers took the backpack from him, whereupon he stated "I am fucked."  *Id.* at 109. Inside his backpack, officers found a large amount of white crystal substance that a presumptive field test identified was 542 grams of methamphetamine.  The drugs were contained inside of five plastic bags.  Mr. Hood admitted to officers that he was "a large scale dealer and that he had several Mexican connections." *Id*. at 112; *accord id.* at 153.  He also admitted that he owned the methamphetamine found in his backpack.

An officer later combined the drugs from the five plastic bags found in Mr. Hood's backpack into a separate bag and sent that bag to the crime lab for testing. At the crime lab, the drugs were found to have a net weight of 526 grams. Testing also revealed that the drugs were 90.6% pure methamphetamine, meaning that out of the net 526 grams, 476.5 grams were pure methamphetamine.  The government does not dispute that the five plastic bags later were destroyed.  The drugs that law enforcement obtained from Mr. Hood were released later to a K-9 unit and then subsequently returned for use in his prosecution.[3]

---

[3]     The drugs were mistakenly released to the K-9 unit.  The secretary for the Weber-Morgan Narcotics Strike Force was notified that the case against Ms. Wilbert had terminated and that she was the only defendant connected to the drugs.  The secretary in turn notified the Ogden City Police Department that the

(continued...)

On August 8, 2007, a federal grand jury charged Mr. Hood by a single-count indictment with possession with intent to distribute fifty grams or more of actual methamphetamine in violation of 21 U.S.C. § 841(a)(1). Mr. Hood thereafter filed a Motion to Dismiss and/or For Other Relief for Destruction of Evidence and Request for Hearing on September 12, 2008. He argued in relevant part that the government impermissibly combined the drugs from each of the five bags into one container and destroyed the bags. As a result, he contended, he was unable to test the amount of pure methamphetamine seized from him. Mr. Hood also argued that the officers in the Ogden City Police Department destroyed the chain of custody as to the methamphetamine when they released the drugs to a K-9 training unit. He alleged that those actions violated his due process rights under *California v. Trombetta*, 467 U.S. 479 (1984), and *Arizona v. Youngblood*, 488 U.S. 51 (1988).

The district court held an evidentiary hearing on the motion and received post-hearing memoranda. It denied Mr. Hood's motion to dismiss, holding that

> Defendant fail[ed] to establish what the apparent exculpatory value of the destroyed evidence is or that the destroyed evidence would exculpate him. Field tests and Crime lab reports establish the presence of methamphetamine and witness

---

[3](...continued)
evidence was no longer needed and could be destroyed. Rather than being destroyed, the drugs were released for K-9 training; the drugs were useful for training purposes because they had been identified as a particular quantity of methamphetamine. Subsequently, officers became aware that they needed the evidence for Mr. Hood's case and the drugs were returned.

testimony establishes Defendant's possession. . . .

> At most, Defendant's position amounts to an argument that the destroyed evidence would be potentially useful. However, the Court finds that Defendant has not presented any evidence of bad faith and, therefore, has failed to meet his burden of establishing that the government acted in bad faith as required under *Youngblood*.

Suppl. R., Vol. I, at 73 (Mem. Decision & Order, dated Jan. 13, 2009) (footnote omitted).  The case proceeded to trial.

Mr. Hood's trial commenced on April 29, 2009.  At trial, Mr. Hood argued that there was a reasonable doubt as to whether he possessed fifty grams or more of methamphetamine.  He theorized that police had added the methamphetamine found in Ms. Wilbert's home to that found in his backpack to total fifty grams or more.  At the close of the government's case, Mr. Hood moved for a judgment of acquittal, which was denied.  In denying that motion, the district court held that "I think the evidence is clear . . . that what was retrieved from [Ms. Wilbert] and what was retrieved from the defendant was separated, and I see no reason not to allow this matter to be submitted to the jury."  R., Vol. III, Pt. 2, at 298 (Jury Trial, dated Apr. 30, 2009).  Mr. Hood presented no witnesses and the jury adjudged him guilty of the single-count indictment.

Well before trial, on January 4, 2008, the government had filed an Enhancement Information, notifying Mr. Hood that he could be subject to increased punishment due to two prior drug convictions.  Those prior convictions

were identified as follows: (1) conviction of the illegal possession/use of controlled substance, a third-degree felony, obtained in Salt Lake Third District Court, Salt Lake County, case number 981900910; and (2) conviction of the illegal possession/use of a controlled substance, a third-degree felony, obtained in Davis County Court, case number 061700272.

One of Mr. Hood's arguments on appeal arises from the government's incorrect identification of the court and place of conviction in case number 981900910. That undisputed error came to light in the following way: After Mr. Hood's conviction in this case, the Probation Office prepared a Presentence Report ("PSR"). The PSR concluded that the § 851 enhancement dictated that a mandatory minimum sentence of life imprisonment be imposed upon Mr. Hood. He objected to that conclusion, challenging the Enhancement Information's reference to his conviction as being obtained in Salt Lake Third District Court, Salt Lake County, case number 981900910. Mr. Hood explained that

> Case Number 981900910 in the Third Judicial District Court, Salt Lake County, is the matter of *State of Utah v. Michael Royce Jackson*, a Class C Misdemeanor, Criminal Trespass matter. . . . [In] the Second Judicial District, Ogden District there is a case entitled *State of Utah v. John M. Hood*, Case No. 981900910, for which further investigation is being conducted. However, the designated case specifically set forth by the government in its notice is not an appropriate predicate offense for a life sentence pursuant to 21 U.S.C. § 851.

Suppl. R., Vol. IV, at 79 (Def.'s Position as to Sentencing Factors, filed July 9, 2009).

In response, the government filed a Motion to Correct Clerical Error, in which it sought "to amend a clerical mistake" in the Enhancement Information—*viz.*, to change the court and place of conviction in case number 981900910 from Salt Lake Third District Court, Salt Lake County to Second District Court, Weber County. *Id*. at 84 (Mot. Correct Clerical Error, filed July 9, 2009); *see also id*. at 86 (Position of Party with Respect to Sentencing Factors, filed July 13, 2009). The government argued that Mr. Hood had been given reasonable notice and an opportunity to be heard under § 851 because he had been given a copy of his criminal history record on August 24, 2007, and this copy contained the correct court and place of conviction in case number 981900910. Moreover, after its filing of the Enhancement Information, on August 5, 2008, the government had provided a copy of the relevant police report in that case to Mr. Hood. As a result, the government believed that "[t]he defendant was, without question, well aware of the conviction intended to be used for the enhancement and amendment to eliminate the clerical error [wa]s appropriate." *Id*. at 130 (Gov't Resp. to Def.'s Sentencing Mem., filed July 20, 2009).

At Mr. Hood's sentencing hearing, defense counsel did not dispute that Mr. Hood had received an accurate copy of his criminal history record and the police report from case number 981900910, but argued that the incorrect court and place of conviction in the Enhancement Information was not a clerical error that could be corrected under § 851(a)(1). The court disagreed and granted the

-8-

government's motion to correct the error. Toward the conclusion of that hearing, defense counsel noted that in challenging an Enhancement Information, it was possible to challenge the underlying convictions themselves "as to whether or not the defendant is the individual who was charged and convicted and whether or not they were represented by counsel and adequately protected by [sic] their constitutional rights." Suppl. R., Vol. VII, at 113 (Sentencing Hr'g, dated July 22, 2009). However, defense counsel declined to raise such a challenge, stating that "I have conducted that investigation and have intentionally elected not to raise that motion." *Id*.

The district court proceeded to sentence Mr. Hood to a term of life imprisonment under 21 U.S.C. §§ 841(b)(1)(A)(viii) and 851, and to 120 months' supervised release. This appeal timely followed.

## II. Discussion

Mr. Hood raises four challenges to his conviction and sentence. We address each in turn.

### A. *Youngblood* Challenge

Mr. Hood does not deny that he had methamphetamine in his backpack on September 14, 2006. Rather, he argues that the district court should have dismissed the indictment against him because the government destroyed potentially exculpatory evidence. More specifically, Mr. Hood challenges law enforcement's destruction of the plastic bags found in his backpack, law

enforcement's combination of the individually bagged methamphetamine into one aggregate amount of drugs, and its decision to send the methamphetamine to the K-9 training unit.

According to Mr. Hood, without that evidence, he was unable to pursue effectively his defense that he did not possess fifty or more grams of methamphetamine, but possessed a lesser amount.[4]  As he argued at trial, Mr. Hood theorizes on appeal that "if some of the bags alleged to have been found in his backpack had already been at Stacy Wilbert's house, and if the bags properly attributed to him contained less than 50 grams of actual methamphetamine, he could not have been convicted of violating 21 U.S.C. § 841([b])(1)(A)(viii)." Aplt. Reply Br. at 2.

Mr. Hood contends that, had the evidence at issue not been destroyed, he would have been able to test the contents of each bag recovered from his backpack before it was "commingl[ed]" and that "he needed fingerprint analysis of the bags."  Aplt. Opening Br. at 19.  He sets forth several hypothetical mathematical equations to demonstrate that it is at least *possible* that all of the

---

[4]  The amount of drugs with which Mr. Hood was charged and convicted, fifty or more grams of actual methamphetamine, is significant under 21 U.S.C. § 841(b)(1)(A)(viii).  That section provides that if a person possesses with intent to distribute fifty grams or more of methamphetamine, "such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life" and "[i]f any person commits such a violation of this subparagraph . . . after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release."  21 U.S.C. § 841(b)(1)(A)(viii).

following propositions could be true:  the drugs he brought in his backpack, when combined with the drugs found in Ms. Wilbert's home, could have totaled 526 grams; the combination of the purity levels of all the drugs could be 476.5 grams of actual methamphetamine; and the amount of actual methamphetamine Mr. Hood carried in his backpack could have been less than fifty grams.  He states that "[t]hese hypotheticals are plausible but unprovable, given the negligent gathering and handling and ultimate destruction of the evidence in this case."  Aplt. Reply Br. at 5.  Mr. Hood therefore contends that the government's destruction of potentially exculpatory evidence violated his due process rights under *Trombetta* and *Youngblood*.  However, we disagree.

We begin, as always, by explicating the applicable standard of review.  As we stated in *United States v. Smith*,

> We review a district court's determination that the government did not destroy potentially exculpatory evidence for clear error.  The inquiry into allegations of prosecutorial bad faith presents a mixed question of fact and law in which the quintessential factual question of intent predominates.  The burden is on [the defendant] to show bad faith.

534 F.3d 1211, 1223–24 (10th Cir. 2008) (citation omitted) (internal quotation marks omitted).

The district court did not clearly err in concluding that Mr. Hood cannot establish a due process deprivation under the standards set forth in *Trombetta* and *Youngblood*.  Addressing the former, we noted,

-11-

> For [the] destruction of evidence to rise to the level of affecting a defendant's Due Process rights under *California v. Trombetta*, the evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*United States v. Pearl*, 324 F.3d 1210, 1215 (10th Cir. 2003) (internal quotation marks omitted); *accord United States v. Bohl*, 25 F.3d 904, 909–10 (10th Cir. 1994). In *Youngblood*, the Supreme Court "extended *Trombetta* to provide that, if the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was potentially useful for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence." *Bohl*, 25 F.3d at 910 (internal quotation marks omitted); *accord Smith*, 534 F.3d at 1224; *United States v. Beckstead*, 500 F.3d 1154, 1158 (10th Cir. 2007).

Mr. Hood cannot satisfy either test. Initially, Mr. Hood has conceded that the destroyed evidence was only potentially exculpatory, thereby eliminating any claim he may have had under *Trombetta*. Moreover, Mr. Hood cannot succeed under *Youngblood* because, even if we assume that the evidence was potentially exculpatory, Mr. Hood conceded in his Reply Brief and at oral argument that the officers did *not* act in bad faith in destroying the evidence.[5] Consequently, his

---

[5] Although Mr. Hood had argued before the district court that the officers had acted in bad faith under a conspiracy theory, he now maintains that

(continued...)

-12-

*Youngblood* challenge must necessarily fail.  "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at 58; *accord Snow v. Sirmons*, 474 F.3d 693, 716 (10th Cir. 2007).

Mr. Hood attempts to salvage his claim by contending that we should hold that bad faith is not required in this case pursuant to Justice Stevens's concurrence in *Youngblood*.  Justice Stevens provided a sixth vote in *Youngblood*, but he only concurred in the judgment.  Specifically, he declined to join in the *Youngblood* majority's opinion, reasoning that "it announces a proposition of law that is much broader than necessary to decide this case."  488 U.S. at 60 (Stevens, J., concurring).  In particular, Justice Stevens objected to the majority's determination that law enforcement's failure to preserve potentially useful evidence does not amount to a due process violation, *unless* the defendant can show that law enforcement acted in bad faith.  *See id.* at 60–61.  He wrote, "[i]n my opinion, there may well be cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair."  *Id.* at 61.

Mr. Hood's reliance on Justice Stevens's concurrence is unavailing for two

_____

[5](...continued)
the officers acted negligently and "us[ed] less than best practices" and admits that they did not act in bad faith.  Aplt. Reply Br. at 2.

reasons. First, at the risk of stating the obvious, Justice Stevens was not speaking for a majority of the Court in *Youngblood*. Indeed, no other justice joined his concurrence. We have never applied Justice Stevens's view as controlling precedent. And we see no tenable basis for doing so here.

Second, even if we could accept the proposition that law enforcement bad faith is not required in cases where the loss or destruction of evidence is so critical to the defense as to render the trial fundamentally unfair, we would have little difficulty concluding on the facts before us that this is not such a case. Mr. Hood's defense turned in large part on the theory that the police had corruptly conspired to add the methamphetamine found in Ms. Wilbert's home to that found in Mr. Hood's backpack in order to subject him to the enhanced criminal penalty associated with possession of fifty or more grams of methamphetamine. To be critical to that defense, the lost or destroyed evidence would have to be, at the very least, favorable to Mr. Hood (e.g., reveal Ms. Wilbert's fingerprints on the destroyed plastic bags). But, as Mr. Hood concedes, it was not apparent "whether the evidence would favor the government or the defendant." Aplt. Reply Br. at 7. Furthermore, Mr. Hood had ample opportunity to advance his defense theory before the jury in other ways. As the government details in its brief, defense counsel extensively cross-examined witnesses regarding whether the drugs obtained from Mr. Hood and Ms. Wilbert were kept separate or (illicitly) combined. Mr. Hood's counsel challenged the handling of evidence and the chain

-14-

of custody, and also vigorously argued the conspiracy theory before the jury. Thus, the jury was fully apprised of the nature of Mr. Hood's defense, thereby reducing, or perhaps even eliminating, any prejudice that might otherwise flow from the absence of the destroyed evidence. *Cf. Youngblood*, 488 U.S. at 59 (Stevens, J., concurring) ("[A]lthough it is not possible to know whether the lost evidence would have revealed any relevant information, *it is unlikely that the defendant was prejudiced by the State's omission*. In examining witnesses and in her summation, defense counsel impressed upon the jury the fact that the State failed to preserve the evidence and that the State could have conducted tests that might well have exonerated the defendant." (emphasis added)).

Moreover, on the question of fundamental fairness, as Justice Stevens's *Youngblood* analysis suggests, "our overriding concern [is] with the justice of the finding of guilt" and "a State's failure to turn over (or preserve) potentially exculpatory evidence therefore must be evaluated in the context of the entire record." *Id.* at 60 (Stevens, J., concurring) (internal quotation marks omitted). The record here indicates that the jury would have had little, if any, basis to adopt Mr. Hood's theory. As the government has argued, "There was strong evidence that Stacy Wilbert's drugs and Hood's drugs were handled entirely separately, never commingled, and that no conspiracy was hatched to add drugs to those carried by Hood." Aplee. Br. at 30. Furthermore, there was evidence in the record that Mr. Hood regularly distributed methamphetamine to Ms. Wilbert in

-15-

quantities in excess of fifty grams and that, when Mr. Hood was arrested, he was bringing Ms. Wilbert the "regular amount," R., Vol. III, Pt. 1, at 147, of approximately 113 grams. Consequently, even if we could be guided by Justice Stevens's concurrence, on the facts of this case, we would conclude that "the loss or destruction of evidence" was not "so critical to the defense as to make a criminal trial fundamentally unfair." *Youngblood*, 466 U.S. at 61 (Stevens, J., concurring).

In sum, we hold that the district court did not clearly err in rejecting Mr. Hood's claim that his due process rights had been violated under *Trombetta* and *Youngblood*.

### B. Civil Spoilation Claim

In the event that we were to conclude (as we do) that there was no due process deprivation, Mr. Hood argues in the alternative that the district court should have imposed some other sanction on the government for the spoilation of evidence. He urges us to apply the civil spoilation standard under which a court may impose certain sanctions even in the absence of bad faith. *See Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1219–20 & n.6 (10th Cir. 2008) ("A spoilation sanction is proper where (1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence." (internal quotation marks omitted)). Mr. Hood contends that "the district court should

have imposed sanctions by excluding government evidence concerning the quantity of drugs. . . . Had the court done so, Mr. Hood would likely have been convicted of a lesser-included offense, one that does not carry life imprisonment." Aplt. Opening Br. at 35; *see also* Aplt. Reply Br. at 9–16.

Although Mr. Hood argued in his Reply Brief that this claim was raised before the district court, defense counsel filed a supplemental authority pursuant to Federal Rule of Appellate Procedure 28(j), indicating that "this Court's discussion of plain-error review in United States v. Wardell, 591 F.3d 1279, 1297–98 (10th Cir. 2009), may be helpful to the Court's resolution" of this issue. Operating with commendable candor, defense counsel then conceded at oral argument that this claim was not raised below. Accordingly, we review it for plain error. *See Wardell*, 591 F.3d at 1297.

Under that "rigorous" standard, Mr. Hood's argument fails. *Id.* When applying plain-error review, "we may reverse a district court's ruling only if [the defendant] demonstrates (1) error (2) that is plain and (3) that affected [his] substantial rights. If these three elements are met, then we may, in our discretion, correct an error that seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at 1297–98 (first alteration in original) (internal quotation marks omitted). Even if we assume arguendo that it was error for the district court not to apply the civil standard governing the spoilation of evidence and not to sanction the government for such spoilation, Mr. Hood "cannot

-17-

establish that such error is plain—that is, obvious and clear." *Id*. at 1298. "[W]e do not deem an error to be obvious and clear unless it is contrary to current 'well-settled law'—that is, to the current law of the Supreme Court or the Tenth Circuit." *Id*. (quoting *United States v. Taylor*, 514 F.3d 1092, 1100 (10th Cir. 2008)). Mr. Hood has cited to no case applying this civil discovery doctrine to the criminal context and, as a result, he cannot prevail under plain-error review.

## C. Error in the Enhancement Information

In his third claim on appeal, Mr. Hood contends that the district court should not have sentenced him to a mandatory term of life imprisonment because the government's Enhancement Information contained what he believes to be a non-clerical, prejudicial error—*viz*., the Information lists the incorrect court and place of conviction for one of his predicate prior drug convictions. Accordingly, Mr. Hood argues that the error could *not* be corrected prior to sentencing, in the way that a clerical mistake may be amended under 21 U.S.C. § 851(a)(1). The error, he contends, resulted in his failure to identify the particular conviction upon which the Enhancement Information relied and Mr. Hood urges us to conclude that the district court erred by enhancing his sentence. We find that any error was harmless.

We review de novo the legality of a sentence, including the adequacy of an information filed under § 851. *See United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1484 (10th Cir. 1994), *overruled on other grounds by United States v.*

-18-

*Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995); *accord United States v. King*, 127 F.3d 483, 487 (6th Cir. 1997).  Section 851 provides in relevant part that

> No person who stands convicted of an offense under this part shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial, or before entry of a plea of guilty, the United States attorney files an information with the court (and serves a copy of such information on the person or counsel for the person) stating in writing the previous convictions to be relied upon.  Upon a showing by the United States attorney that facts regarding prior convictions could not with due diligence be obtained prior to trial or before entry of a plea of guilty, the court may postpone the trial or the taking of the plea of guilty for a reasonable period for the purpose of obtaining such facts.  Clerical mistakes in the information may be amended at any time prior to the pronouncement of sentence.

21 U.S.C. § 851(a)(1).  "A district court cannot impose an enhanced sentence unless the Government complies with § 851(a)'s requirements."  *United States v. Balderama-Iribe*, 490 F.3d 1199, 1204 (10th Cir. 2007).

Mr. Hood asserts that "[t]he question in this appeal is whether the identification of the wrong court and location is a clerical error capable of correction, or if it is such that the Information was insufficient to enhance Mr. Hood's sentence to life imprisonment."  Aplt. Opening Br. at 37.  In other words, Mr. Hood posits that if we are unable to conclude that the error in the Enhancement Information is a correctable clerical error, we must determine that the Enhancement Information cannot provide the basis for his life sentence and, accordingly, declare that sentence to be fatally infirm.  Our decisional options,

-19-

however, are not so narrowly circumscribed. Even if we were to conclude that the error in the Enhancement Information was more than a correctable clerical error (i.e., non-clerical), we still would be free to conclude that such an error was harmless.

In *Gonzalez-Lerma*, for example, we effectively endorsed and applied a harmless-error analysis. 14 F.3d at 1486. There, the Enhancement Information contained an incorrect date of conviction, did not specify the place of conviction other than specifying the state in which the conviction occurred, and did not provide a case number. *Id.* at 1485. We determined that the incorrect date was a clerical mistake that could be amended any time prior to the pronouncement of sentence under § 851(a)(1). *Id.* at 1486. As for the omitted information regarding the precise location of the conviction and the case number, we determined that, despite those omissions, the government's Enhancement Information provided sufficient notice to the defendant of its intent to enhance his sentence based on the prior conviction. *Id.* We said that § 851 was enacted to fulfill the due process requirement that a defendant "receive reasonable notice and opportunity to be heard relative to the recidivist charge even if due process does not require that notice be given prior to trial on the substantive offense," and determined that the defendant had received sufficient notice and an opportunity to be heard. *Id.* at 1485–86 (internal quotation marks omitted). The government had allowed defense counsel "to explore the contents of the judgment" and the

defendant had not challenged his prior conviction, but rather had challenged the timing of the Enhancement Information and its specificity. *Id.* at 1486. We applied harmless error review and declined to adopt a "hyptertechnical approach" to § 851. *Id.*

We also applied a harmless-error analysis in *United States v. Lopez-Gutierrez*, 83 F.3d 1235, 1246 (10th Cir. 1996), which involved a decidedly non-clerical error. In that case, the district court had failed to comply with § 851(b) when it did not ask the defendant whether he affirmed or denied the previous conviction. *Id.* We concluded that the error was harmless: the defendant did not allege any prejudice caused by the omission, and the defense counsel had conceded the fact of the previous conviction during a pre-trial motion. *Id.* at 1246–47.

Accordingly, our precedent indicates that even if we find that an error is non-clerical—*viz.*, not an error subject to correction under § 851(a)(1)'s express terms—we nonetheless may conduct an inquiry into whether any such error was prejudicial. *See also United States v. Severino*, 316 F.3d 939, 944 (9th Cir. 2003) ("The clerical error provision, which allows the government to correct 'clerical mistakes' in an information before sentencing, does not raise the inference that no other mistakes are permitted. . . . If the error is deemed to be clerical, the government may simply correct it by filing an amended information without showing that defendant was not misled. If the error is non-clerical, however, the

information is deemed defective *unless* the government shows that defendant could not reasonably have been misled to his prejudice as to the identity of the prior conviction." (footnote omitted)).

Applying these principles here, we conclude that even if we were to accept Mr. Hood's contention that the Enhancement Information's error regarding the court and place of conviction was not clerical, we would still reject his challenge to the Enhancement Information on harmless-error grounds because he was not prejudiced.[6] Mr. Hood has not disputed that he received a copy of the relevant police report for that conviction as well as a pretrial report that accurately recounted his criminal history. Moreover, although the Enhancement Information identified the wrong court and location for the relevant conviction, it did include other correct identifiers like the proper case number. Significantly, at the time Mr. Hood filed his objections to the PSR, he expressed (through counsel) his actual knowledge of a conviction associated with his name that had all of the same information found in the Enhancement Information and, in addition, had the correct court and location of conviction. In other words, at the time he filed his sentencing objections, Mr. Hood was aware of facts that would have allowed him to reasonably infer that the conviction of which he had knowledge was the same conviction listed in the Enhancement Information, notwithstanding its flawed

_____

[6] Although Mr. Hood argues that the error was not harmless, he makes no attempt to explain *how* he was harmed and we are convinced by the government's argument that he did not suffer any prejudice.

-22-

description there. And finally, at the sentencing hearing, defense counsel explicitly declined to contest that Mr. Hood was in fact the person who had suffered the at-issue conviction listed in the Enhancement Information. Because Mr. Hood had sufficient notice of the prior conviction upon which the government sought enhancement as well as an opportunity to be heard, the Enhancement Information's incorrect identification of the court and place of conviction would be at most harmless error. We therefore affirm the district court's enhancement of Mr. Hood's sentence.[7]

### D. The Court's Duty to Inquire Into Relationship With Defense Counsel

In Mr. Hood's fourth and final claim, he argues that the district court sua sponte should have inquired into Mr. Hood's relationship with defense counsel to investigate a possible conflict based on Mr. Hood's statements about defense counsel at his sentencing hearing.[8] This argument can gain no traction. As

---

[7] Because we affirm the district court's enhancement under §§ 841(b)(1)(A)(viii) and 851, we need not address Mr. Hood's contention that he does not qualify for career-offender status under the Guidelines.

[8] Mr. Hood stated that "there are some reasons that we didn't talk about at trial that I felt were pertinent. I asked [defense counsel] about some of these things and he advised me different [sic] or did it in a different manner." Suppl. R., Vol. VII, at 102. Mr. Hood also referred to the fact that the defense presented no witnesses on his behalf at trial, saying "[a]t my trial, we didn't call any witnesses on my behalf, not one. I've asked [defense counsel] that. He says that it wasn't necessary. I don't understand that." *Id*. at 104. Mr. Hood also noted that the defense did not present any expert witnesses. He later stated that "I should have taken the stand at my trial. I never did that. I was advised not to do

(continued...)

-23-

the government rightly states, "there is no statutory or case law suggesting the

[8](...continued)
that, which I think was a gross injustice. I should have been able to testify and speak on my behalf." *Id*. at 105. Mr. Hood also said that "I asked [defense counsel] several times to have the evidence tested. I believe that is a right of mine. [Defense counsel] said no numerous times. I also asked him for a bench trial. . . . He told me no." *Id*. at 107. He continued,

> I asked [defense counsel] if he could beat this case. He told me that we're going to throw the dice up and not throw the dice down. You know, had I known that was the case, I might have worked with the government on a deal. I don't know. Now I'm looking at life. I just feel like that [sic] these things were not handled properly. For reasons why, I don't know. [Defense counsel] did very well in his motions to suppress and his evidentiary hearing.

*Id*. at 108. Mr. Hood then began to explain further the legal arguments in his motion to dismiss, but the court interrupted him, saying,

> We're not here to reargue these matters. The Court has made rulings, Mr. Hood. . . . I agree with you, I think [defense counsel] has done an exceptional job to bring to the Court's attention those matters that need to be brought to the Court's attention. [Defense counsel] has appeared in my court many times and I have found him to be very, very competent in every respect.
>
> Now if there is any error, if there is anything shown to the appellate court that is wrong in your behalf, those matters will be reviewed and you will receive further consideration. But I'm not here to retry this case. . . . I don't know all that's gone on behind the scenes, but I do know that [defense counsel] has brought to the attention of the Court those evidentiary matters that were pertinent to this case and the Court has made rulings. . . .
> . . . We're not here retrying the case.

*Id*. at 108–09. Mr. Hood indicated that he understood and that he had nothing further to say.

duty Hood advocates. To the contrary, the cases suggest that district courts generally do not have a duty *sua sponte* to inquire into the attorney-client relationship." Aplee. Br. at 50. A district court has no such duty, particularly when it is presented only with the unsworn, unsupported, and at times contradictory, allegations of the defendant at his sentencing hearing. *Cf. United States v. Meacham*, 567 F.3d 1184, 1187–88 (10th Cir. 2009) (holding that the district court did not abuse its discretion in denying, without an evidentiary hearing, a motion for a new trial based on counsel's alleged refusal to allow defendant to testify on his own behalf; discussing the fact that the claim regarding counsel's refusal was unsupported by an affidavit or testimony under oath); *United States v. Stark*, 507 F.3d 512, 516 (7th Cir. 2007) (in holding that a trial court is not required to question a defendant sua sponte to ensure that he knowingly and intelligently has decided not to testify, stating that "[c]riminal defendants and their lawyers often do not see eye to eye. If a district court were compelled to inquire into every potential conflict it thought it had spotted, there would be a risk of multiple, unnecessary proceedings, some of which might even imperil the attorney-client relationship. More is needed before this kind of judicial duty arises."); *United States v. Van De Walker*, 141 F.3d 1451, 1452 (11th Cir. 1998) (rejecting argument that there is a per se requirement that a district court inquire into decision of criminal defendant not to testify, and discussing concerns about intruding into the attorney-client relationship or

influencing the defendant's choice); *United States v. Robinson*, 913 F.2d 712, 716 (9th Cir. 1990) (holding that the district court did not err in failing to make further inquiries into the defendant's complaints about counsel when the defendant made no motion for substitution of counsel). We decline to impose this duty upon district courts or to interfere unnecessarily in the attorney-client relationship. In so holding, we emphasize that we do not suggest that Mr. Hood is unable to raise these issues in a collateral ineffective-assistance-of-counsel claim. He remains free to do so.

## III. Conclusion

For the foregoing reasons, we **AFFIRM** Mr. Hood's conviction and sentence.